NOVEMBER TERM, 1870.

21 561
47 262
21 561
51 250

HARRIS and others, appellants, and VANDERVEER'S EXEC-
UTOR, respondent.

1. At the time of the execution of the will the testator's hearing was seriously impaired, and his eyesight almost gone; probate of the will refused, because it did not appear that its contents were in any way made known to him before or at the time of its execution.

2. The burden of proof is on the proponent; it will not be presumed from the fact that the testator had testamentary capacity, that he would not have executed the will without understanding its contents.

3. Not necessary to decide whether testator's declarations, before and after execution of the will, are admissible.

This is an appeal by the caveators from a decree of the Prerogative Court, admitting to probate the will of the late Dr. Henry Vanderveer. The opinion of the Ordinary is reported in 5 C. E. Green 463.

*Mr. Wurts, Mr. Shipman,* and *Mr. C. Parker,* for appellants.

*Mr. Williamson* and *Mr. Frelinghuysen,* for respondent.

The opinion of the court was delivered by

VAN SYCKEL, J.

The several appeals in this case submit to review the right of the respondent to have probate of a paper bearing date August 23d, 1865, purporting to have been executed by Dr. Henry Vanderveer, late of the county of Somerset, as his last will and testament.

The rights of the next of kin and the heir-at-law, upon the death of the ancestor intestate, to such worldly estate as he may leave, is securely guarded by our laws, and can be divested only by a testament executed in strict conformity

with law. While the courts of this state have ever guarded with exacting jealousy the right of testamentary disposition,. the burden has always been cast upon the proponent, of establishing a strict compliance with every essential to the validity of a will.

The will in this case has been assailed upon three principal grounds. 1. Want of testamentary capacity. 2. Undue influence on the part of Dr. Cornell. 3. Imposition of the instrument upon the testator without a full knowledge on his part of its contents.

The evidence presents the testator, both before and after the execution of this paper, as a man of vigorous intellect,. a gentleman of the old school, of much culture and refinement, and exempt in a rare degree from physical and mental infirmity, at the advanced age of more than four score years; and although at the date of the disputed will his eyesight and hearing were much affected and his general health impaired, there is no sufficient evidence which denies to the testator the possession of testamentary capacity. There is, also, an absence of evidence to show that Dr. Cornell, however much he may have urged his good offices on the testator, or whatever may have been his desire to secure for himself or his son a place in his testamentary disposition,. had acquired such influence as would have enabled him unduly to induce the testator to execute, with full knowledge of its contents, any paper which did not express his own purposes with regard to his estate.

The case of the appellants must stand, if at all, upon their third ground of objection.

Is the evidence of such a character that it satisfies the mind and judgment of the court, that the will of August 23d, 1865, was executed by the testator with full knowledge on his part of its contents? While the intellect of the testator was somewhat clouded by a temporary illness, it is. clearly shown that his hearing was seriously affected, and his eye-sight almost gone, at the time his signature to the instrument in question was procured. The testamentary

witnesses substantially state this fact, and it is put beyond question by Brown, Vanarsdale, J. F. Vanderveer, Amos, and others, so that it must be regarded as a conceded fact in the case. A blind and deaf person may make a will, but it must be shown by the proponent to the satisfaction of the court, that he knew its contents and was not imposed upon in its execution. This introduces a new element into the consideration of this controversy, and starts the inquiry, not only whether he signed and pronounced it to be his true last will and testament, in the usual form of execution, but whether he fully understood its contents. Naylor, the first testamentary witness, says that the will was not read in his presence, nor did the testator say that he knew what it contained. Wight, the other subscribing witness, says he read the will as a whole to the testator in the presence of Dr. Cornell, but does not say that the testator acknowledged, or in any way signified that he understood what was read to him; and Dr. Cornell in his examination in chief says, that after the will was written, he came into the room, and the will was read to him, Dr. Cornell.

The evidence then strictly is, that Wight says he read the will to testator in presence of Dr. Cornell, and Dr. Cornell says it was read to him; neither asserting anywhere that the testator admitted at the time, or afterwards, that he understood its contents. Neither Wight nor Dr. Cornell pretends that the testator asked the legal effect of any provision made, or expressed the least desire to have any passage read a second time, or suggested the slightest change in the disposition made. Giving full credit to this evidence, does it fully discharge the proponent from the burden which the law imposes upon him?

A simple examination of this will shows the difficulty the testator in his then condition, would have had in comprehending its provisions upon a single reading. There is a volume of other evidence in the cause which must have an important bearing on this issue. William Vanarsdale testifies that a day or two after this will was executed, the

testator asked him if he knew Wight; that Dr. Cornell and
Wight had been making his will, and he didn't know
whether it was right or. not; that Wight was a stranger,
and he didn't know whether he would do it right.   In 1867,
the testator told Dr. Henry Vanderveer that he wished him
to urge his boys up to get married, as there was a large·
estate coming to them.   There is no pretence of the existence
of an executed will subsequent to that of August 23d, 1865,·
and therefore the testator must have been speaking of that
will, and could not have understood its contents.

In this disputation we must keep in perpetual view that
the will in question crushes the cherished purposes of the
testator's life, intentions declared in his own writing through
years, and attested by various witnesses in this cause, but
by none more emphatically than by Wight, on the very
day he prepared the will.   He states that the testator, in
giving his instructions for the disposal of his estate, said :
" I wish to leave it in the Vanderveer name; I wish it
called Vanderstadt, and I wish a trustee to hold it forever
if he could."   Hold it forever, how ?   Manifestly in the
Vanderveer name.   Even Dr. Cornell, himself, says, that
the testator, shortly before this will was executed, told
him, that he was very anxious to transmit his property to
" three successive generations."   What three successive
generations could this mean ? generations of Cornells, or
generations of Vanderveers ?   Nothing but utter imbecility
of intellect could have extinguished his pride in the Vander-
veer name.   This testimony should close the controversy as
to the cherished purposes of the testator to perpetuate his
name by a testamentary disposition, up to, and at the time
the will of August 23d was being drawn; did not Dr.
Cornell attempt to prove that Dr. Vanderveer subsequently
declared another purpose in a memorandum in his own
hand, from which the Conover will was drawn, December
7th, 1866, and ask the court to infer from this that the
testator's mind had undergone a change since he drafted
his earlier wills ?

Simply referring to the fact that no offer or attempt was ever made to execute the Conover will, that no subsequent declaration appears that it embodied his wishes, there can be little doubt that his mind, if ever changed, could not long have withstood his original and long cherished wish to perpetuate the name of Vanderveer through Vanderstadt. Indeed this is not left merely to inference; in Exhibit L, dated May 5th, 1868, found among testator's papers after his decease, he declares a desire, " to dispose of his estate so as to perpetuate it undivided, and transmit his name therewith in perpetuity." Thus it is shown, that as he advanced in life, the desire grew upon him that his name should ever be preserved in the uses to which Vanderstadt was devoted.

With these known purposes existing in the testator's mind for years before, and on the very day of its execution, a paper is propounded as his last will and testament, which, if it does not wholly defeat, effectuates them in a .very slight degree. No benefit is conferred upon any Vanderveer, save Lawrence. The property is wholly put into Dr. Cornell's possession, with no words therein limiting his scheme of expenditure in the slightest degree, and so arranged that the proud name of Vanderveer should forever depart from Vanderstadt, after the taste of Dr. Cornell had adorned and beautified it at unlimited expense, unless the strange contingency should happen that Lawrence, a bachelor of thirty-five and still unmarried, should have lawful male issue which shall survive at his own death. How strangely the purposes pronounced in this instrument differ from those which, Wight says, came from the lips of that venerable man on the 23d of August, 1865.

In determining whether this will is the exponent of Dr. Vanderveer's intentions, the acts and declarations of Dr. Cornell and Wight cannot be disregarded. I agree with the learned Chancellor that the declaration of Dr. Cornell that he did not wish to be executor or trustee, is justly subject to criticism. He not only, so far as appears, failed to make the slightest attempt during the three years that the

testator survived the date of this will, to withdraw from the trust he had accepted by having some one substituted in his place, but with a haste which shows a want of delicacy and propriety, unsuccessfully attempted to have the will proved without the delay required by law.  Dr. Cornell's statement to John M. Brown, that he had requested the testator " to remember a member of Dr. Cornell's family in the will;" the fact that both his son and himself are largely benefited by the will; his declaration that he proposed John M. Brown as a testamentary witness, to which the testator objected, when it is not denied that the testator, both before and after this time, showed much confidence in Brown; his statement that he had the will at home sealed up and knew nothing of its contents, except what Wight had told him; his utter inability to have taken a copy of it, if that was true, or to give any plausible account of his purpose in taking such copy; the fact that this will was executed in such haste, and taken away by Dr. Cornell and never again submitted to the testator's consideration, or its entire contents talked about by him; his remark to Israel Harris, that the will was handed to him sealed up and had not been opened, and the distinct statement of Mrs. Alward, that the testator, about one month after this will was executed, said to her that it was his intention that the bulk of his estate should remain in the Vanderveer family; cannot escape the scrutiny of the court, and admonishes us to be careful that we do not defeat the true will of Dr. Vanderveer in our desire to preserve the right of testamentary disposition.

Wight has thrown a suspicion around his testimony by declaring his unwillingness to serve as a witness to the will without taking any subsequent measures to remove himself from a position so disagreeable; and this suspicion is not shaken by his statement of the successful manner in which he had on previous occasions played the character of witness to a will.  The interview between the testator and Wight while the will was being drawn, as given by Wight himself, is persuasive evidence to show that the true intentions of Dr.

Vanderveer found no expression in the instrument then prepared. In Wight's language, the testator wished to leave his estate in the Vanderveer name, he wished it called Vanderstadt, to be held in the name of a trustee for ever. When he told him he could not tie it up longer than two lives in being, he then said he intended to give it to one of the Vanderveer boys for life, and after some hesitation as to which one, he fixed on Lawrence, and believing that he could not tie it up as long as he wished, said it might go to Lawrence's son, if he should have any, or, in default on that side, would give it to Dr. Cornell's eldest son. Where in this will are these instructions carried out? Does this paper pass the estate to Lawrence for life, and then to his son, if he should have any? Far from it; it can scarcely be said to go to Lawrence for life, and it goes to his son only on the doubtful contingency that he survives his father. Wight further says, that the testator hesitated whether to give Lawrence or John the first place in the will, showing that they two occupied the first place in his affections, and yet he most unaccountably, after giving the preference to Lawrence, discards John altogether, and in the position John would have so naturally occupied the name of Dr. Cornell's eldest son is written, of whom he knew so little, and for whom he never before or afterwards had expressed the least regard, not even naming him in the Conover will.

There can be no absolute presumption that a man of testamentary capacity would not execute a will without understanding its contents, for such assumption wholly dispenses with the rule of law that it must appear as a fact that the contents were in some way made known to him.

To the argument so strongly pressed, that Dr. Cornell would not have attempted an imposition which was subject to so many chances of detection by Dr. Vanderveer, it is sufficient to say, that the burden of proof being on the proponent to establish the fact that the contents and purport of the will were in some way made known to the testator when he gave his name to it, the evidence leaves that ques-

tion in such a state of doubt and improbability that I cannot give my voice to sustain it.

It is proper to say, that it is not intended to intimate any opinion as to the admissibility of the testator's declarations, before and after the execution of the will; they have been used in the argument on both sides without objection, each party claiming a benefit from them. The same remark will apply to substantive evidence, offered to prove the statements of Dr. Cornell before he came on the stand as a witness, and to declarations made by Wight, to which his attention was not called on his cross-examination.

The views here taken dispose of the appeal of Lawrence Vanderveer.

My opinion therefore is, that the decree of the Ordinary should be reversed, and probate of the entire will refused. The decree below having been in favor of the proponent, costs, expenses, and reasonable counsel fees, are to be allowed out of the estate on both sides, in this court, and in the court below, to be settled by the Ordinary.

BEDLE, J.

The paper offered for probate as the will of Dr. Henry Vanderveer, deceased, is dated August 23d, 1865, and purports to appoint the Reverend Frederick F. Cornell as executor, and then bequeaths and devises to such executor all the real and personal estate of the testator, in trust, to take possession and hold the same, and receive the income thereof, with power to sell and convey any of the real estate, except that in Bedminster township, Somerset county, and to invest and re-invest the personal estate as often as shall be necessary; also, to care for the real estate in Bedminster township, to be known as Vanderstadt, and to improve the same as the said trustee shall see fit, devoting any part of the income of the whole estate, necessary for that purpose, and to employ such persons, at such expense, as he may see fit; and also, in further trust, to pay over to Lawrence Vanderveer, a son of Dr. Henry Vanderveer, who (Dr. Vanderveer)

is a cousin of the testator, the balance of the income of the estate, and at the decease of the said Lawrence, to transfer the whole estate to the lawful male issue of his body, if any him surviving, or in default of such issue male living at the decease of the said Lawrence Vanderveer, then to transfer and convey the same to Frederick F. Cornell, jun., son of the said trustee, to have and to hold to him, his heirs and assigns forever. The alleged testator died May, 1868, leaving personal estate amounting to about $245,000, and two farms, together containing about 700 acres, one on each side of the north branch of the Raritan; a large part of which he inherited from his father. The deceased was a physician, a bachelor, and at his death was about ninety-one years old. He had no relatives nearer than cousins. Dr. Henry Vanderveer, one of the appellants and the father of Lawrence, being his only cousin on the Vanderveer side, and the appellants, Henry S. Harris, Israel Schenck, John F. Schenck, and Gertrude Griffin, being the only cousins now living (so far as appears from the evidence) upon the side of the mother of the deceased. Besides these, he had relatives more remote, and among them was Dr. Cornell, who, it seems, was a second cousin through the mother of each. The appellant, Dr. Henry Vanderveer, has three children, Lawrence, John, and Louisa. Lawrence is unmarried, and at the death of Dr. Vanderveer was about thirty-five years of age. The only beneficiaries in being named in the will, are Dr. Cornell, the executor and trustee, with the large powers therein given, Lawrence Vanderveer, whose interest is limited to his life, and Dr. Cornell's son, the latter being entitled to the whole estate should Lawrence leave no male issue him surviving.

The paper was executed at the residence of the deceased. Lawrence was not present; Dr. Cornell was. Besides Dr. Cornell, two others only were present; one, Edwin M. Wight, a lawyer of New York city then living at Somerville, and who was then the partner of Frederick F. Cornell, jun., in the practice of law in New York, and also with him engaged

in other business quite largely, outside their profession; the other was Samuel Naylor, a miller at the mill of the deceased. Wight and Naylor are the subscribing witnesses, the former having drawn the paper, and both were requested by Dr. Cornell to be present at Dr. Vanderveer's on the day the paper was signed. . Dr. Cornell says this was done at the suggestion of Dr. Vanderveer, but the evidence is clear that Dr. Vanderveer had no personal contact with either Wight or Naylor on the subject of his will, till the day they were present at the immediate request of Dr. Cornell. The inmates of Dr. Vanderveer's house usually consisted of some blacks who had lived with him for years, and some of whom were formerly his slaves; and besides those, some relative would, at times, remain with him; sometimes he would have persons hired to keep house for him. On the day in question (August 23d, 1865,) his cousin, Mrs. Griffin, was there, but not present at the drawing or execution of the paper. Dr. Cornell was a frequent visitor at the house of deceased, from June previous up to that time, and usually saw him alone. Wight had gone from Somerville to New York city the morning of August 23d. He left New York at 12 o'clock in company with Dr. Cornell, who had gone to the city for him to go to Dr. Vanderveer's. Dr. Cornell lived also near Somerville; and Wight having dined at Cornell's on their arrival from New York, they both rode some seven miles to Dr. Vanderveer's, reaching there about 4 o'clock, at which time Wight says that he drew the will from instructions obtained from the testator.

Dr. Vanderveer was then eighty eight or nine years of age, with hearing impaired and eye-sight so affected that he could not *see to read*. This inability to read was owing to a temporary trouble with his eyes, which existed for a few weeks, both before .and after the paper was signed. . Ordinarily he was in remarkable health, and had good eye-sight for one so old, but at this time it is clear that he could not see to read. It is also clear that on the night previous he was taken with a sudden *illness* which severely affected him, and from which he was suf-

fering, although much relieved, when the paper was signed. He was then so feeble that he had to be helped by Dr. Cornell up to the stand to sign the paper, and then be helped away from it. His mind, although not so feeble as to render him then entirely incapable of making a will with proper assistance, was in such an enfeebled condition, together with his defect of hearing and inability to read, as to make him a very easy victim or subject for undue influence or misunderstanding. He could only depend upon those who surrounded him. Those three were Dr. Cornell, Wight, and Naylor; the latter being only present for a short time as a witness to the formal execution. The paper is produced by Dr. Cornell, and he says it was kept in his safe at his house, from the day it was signed till after Dr. Vanderveer's death. The formal execution is proved by Naylor, without the aid of the other subscribing witness; and under ordinary circumstances, the law presumes from the fact of the signature, that the testator knew the contents. This paper bears the signature of Dr. Vanderveer, made by him in Naylor's presence; but notwithstanding this, does that presumption exist in this case? Naylor says, that Cornell requested him to come up there; that the doctor was about making his will and wanted him to sign it, and that the doctor did not wish it known, and told him to keep it still; that he then went to the doctor's house and into his room; that he was then sitting in a rocking chair; that the doctor recognized him after he spoke to him, but thinks he did not before; that he said he felt better, but last night he thought he was going to step out; that the paper (the will) laid on the table or stand, (thinks the stand,) with a newspaper on the top of it, covering everything but the seal and clause of attestation; that he (Dr. Vanderveer) was sitting about ten or twelve feet from the paper, and Cornell went to him and said, now, doctor, we are ready; that the dominie took hold of him, helped him out of the chair, and kind of led him there; that Wight was standing there by the will; thinks Wight gave him the pen; that Dr. Vanderveer felt on the

paper, felt the seal, and some one told him that it was right; thinks it was Cornell; that Wight asked him if he acknowledged that to be his last will, but the doctor made no reply; that he went on and said that was his last will and testament, 'to which I affix my name, and is the best I can do under present circumstances;' he said his eye-sight was poor, he said he couldn't see. Naylor also says, that Wight was going to ask him whether that was his last will and testament before he said it, that Wight said something about it, but he went on and said it himself. Whether the question of Wight was heard by Dr. Vanderveer, it appears to me is quite doubtful. Naylor further says, that the doctor signed the will right away on being helped to the stand, and that Cornell helped him away, and that he, Naylor, signed his name while he (the testator) was walking from the table to the chair. He also says, that he thinks Cornell asked him to put his name there as a witness, although he is not certain about that, and he says distinctly, that the will was not read over in his presence. Naylor left the room in five or ten minutes after signing his name, and when he left he thinks Wight was taking the will up and folding it, or doing something with it. Wight says, that when completed he handed the paper to the testator, who said to Dr. Cornell, guess you had better take it, or words to that import. Wight also says, that he drew this paper that day in the room of Dr. Vanderveer, the doctor having first produced a paper in his own handwriting, and in giving the description of it, witness says, it was a draft lacking the essentials of execution to be a will, but could not say whether complete, except for execution, as his attention was called to the earlier part of it; he says that the testator said, you make the first part like that, or words to that effect; the part which he says he copied, being a clause containing his religious faith, (which by the way is a crude mixture), and directing the burial of his body. When asked what became of that draft, he answered on oath : "I have never seen it since, I

should say I don't know." No such paper in Dr. Vanderveer's handwriting, or any other, has been produced, which is certainly a curious circumstance, as several drafts of wills were found among his papers, in his own writing, and some bearing his signature, but all differing materially from the paper in question.

It is unnecessary to refer to any more of the peculiar circumstances at the time of the execution of this paper. There is already sufficient stated to throw upon the proponent the burthen of showing that the testator was in some way made acquainted with the contents of the paper. The fact of the old age of the deceased, his feebleness, his defective hearing, his inability to read, and the presence about him of an important beneficiary, and also the partner in law business, and otherwise, of the contingent residuary legatee and devisee, brought there at the immediate request of his father, together with the opportunity for fraud, and the suspicious circumstances stated, all fairly and legally require that the proponent should show that Dr. Vanderveer knew the contents of the paper. 1 *Jarman* 45, 49; 2 *Green's Ch.* 549; 3 *Wash. C. C.* 580; 2 *McCarter* 310. This knowledge may be drawn from the reading of the will under such circumstances as to reasonably create the belief that the testator heard it, or from its having been drawn according to his instructions, or from an acknowledgment that it had been read to him, or from other circumstances, which induce the belief that he must have known the contents; the amount and kind of proof depending very much upon the circumstances of each case, and being necessarily relative, according to the degree of capacity, and suspicion of fraud, or doubt of the testator's knowledge of the contents.

The important issue then before us, is of fact exclusively, whether Dr. Vanderveer knew the contents of the paper he signed. It was not very unlike other drafts he had made, so far as Lawrence Vanderveer was concerned,

but in other respects it was entirely different. How it agreed with the draft Wight says was produced when the paper was signed, we are not informed. The fact of knowledge of its contents, rests upon the testimony of Wight and Cornell alone. With the burthen upon the proponent, under the facts of this case, Naylor fails to prove the paper as the will of· Dr. Vanderveer.

The proponent from the testimony of Wight, and his own, seeks to prove that this paper was drawn from certain instructions, in substance given by Dr. Vanderveer, and that after it was drawn it was read to him; and here is the vital part of the case. I shall not refer in particular to the evidence, or its weight in support of that position, nor to that that may bear against it. The facts have been elaborately and most ably argued, and the effect they produce upon the mind need only be stated.

The result as to myself is, that I am not satisfied that Dr. Vanderveer knew the contents of the paper he signed. The evidence has failed to convince me that he did. This conclusion is undoubtedly in conflict with some of the direct evidence, but in examining that, with all the legitimate facts and circumstances of the case, the rules and probabilities of human conduct should not be disregarded. It is not strange that in admitting this paper to probate, the Ordinary should have done it reluctantly, and with much misgiving, as his opinion shows. The question of fact is undoubtedly embarrassing, but my own judgment fails to be satisfied in favor of the proponent, and although the right of disposition by will should be carefully protected by the court, yet in this case, the circumstances have imposed a burthen upon the proponent from which the evidence has not relieved him, and enabled me to say that the paper propounded is the will of the deceased. To this extent only, need this opinion go. Beyond that, a discussion· of the evidence is to me undesirable.

The appeal of Lawrence Vanderveer was brought by reason of a suggestion in the opinion of the Ordinary,

whether certain parts of the will, particularly that in relation to him and his issue, could be admitted to probate to the exclusion of the rest. Although it is quite evident that the deceased had previously expressed an intention in different drafts of wills unexecuted, that Lawrence should have the chief part of his estate for life, yet it in no way appears that his intention was to give him the whole income. By striking out all the clauses, excepting that appointing the executor, and bequeathing and devising the estate to him in trust, with power to receive the income, and invest, and reinvest, and to convey certain real estate, and then to pay over to Lawrence during his lifetime, the balance of the income, and at his decease to transfer the whole estate to his lawful male issue surviving, if any he shall have, it would result in giving Lawrence the whole income of the estate, (deducting the necessary expenses of the executorship and trusteeship) to the exclusion of all others, who also might be expected to be objects of his bounty. I am not satisfied that such was his intention. The paper was evidently drawn as an entirety, and its clauses cannot be separated so as to say, from the evidence, that any one part by itself, was according to the intention of the deceased. This view renders any expression on the validity of Lawrence's appeal unnecessary, or any consideration of the extent to which the court would go in admitting part of a will to probate.

The decree of the Prerogative Court should be reversed.

*For reversal*—BEDLE, CLEMENT, DALRIMPLE, KENNEDY, OGDEN, VAIL, VAN SYCKEL, WOODHULL. 8.

*For affirmance*—BEASLEY, C. J., OLDEN, SCUDDER. 3.