Hildreth v. Marshall.

JONATHAN HILDRETH

v.

WILLIAM MARSHALL.

1. It being assumed that M. instructed J. to prepare her will, and that, after preparing the will, J. entered the room where M. was with two persons, whom he had asked to be witnesses to the execution of the will, and, in their presence, announced to M. that he had brought those persons to witness the will, and thereupon M., understanding the character and contents of the document, signed it in presence of the persons so brought in.—*Held*, that the requirement of the statute, that the will should be declared by the testatrix in the presence of the witnesses, was sufficiently complied with.

2. A woman ninety-four years of age, suffering with an intestinal complaint which caused her intense pain when she was not under the influence of narcotics, to whom opium was administered every hour, the effect of which was either to make her drowsy and lethargic or to put her to sleep; who was so enfeebled that she could not rise in her bed or read or write, within four days from her death, and after her physician had pronounced her to be in a dying condition, at the instance of a nephew, executed a will which gave substantially her entire estate to that nephew, taking it from her husband and only brother, between whom she had divided it by will a little more than a month before.—*Held*, that, even though she may have possessed testamentary capacity, the proponent of the will must affirmatively establish, by clear and satisfactory proof, that the will was read to her and understood by her.

On appeal from a decree of the Cumberland county orphans court.

*Mr. John W. Wescott* and *Mr. George A. Vroom*, for the appellant.

*Mr. William E. Potter* and *Mr. James S. Ware*, for the respondent.

THE ORDINARY.

The decree in question refuses to admit to probate a paper purporting to be the last will and testament of Anna E. Marshall, deceased.

16

Mrs. Marshall resided for some seven years immediately preceding her death at Bridgeton in this state, where she died on the 8th day of March, 1893, at the age of ninety-four years, seized of two houses and lots, the value of which is not directly proved. One of the buildings is a double house, and from the amounts of the legacies made payable from the proceeds of its sale by a will hereinafter referred to, and from some testimony as to the character of the tenants of the two pieces of property and the rents they pay, I infer that the entire estate may be worth something between $2,000 and $5,000.

Mrs. Marshall was married twice. By her first husband, whose name is not disclosed, she had three children, all of whom died childless. She married her second husband, William Marshall, in August, 1871. He survives her. At her death he was seventy-seven years of age.

Her next of kin and heir-at-law is an only brother, John Hildreth, who, at her death, was seventy-six years old. This brother has a son named Jonathan, forty years of age, who is the appellant and proponent of the disputed will.

The paper in question bears date on the 4th of March, 1892, four days before Mrs. Marshall's death, and, by its terms, bequeaths legacies of $25 each, to the husband and brother of the testatrix, and devises and bequeaths the entire residue of estate of Mrs. Marshall to her nephew, Jonathan, making him its sole executor.

Its admission to probate is resisted upon four grounds—*first*, because, when it was made, the testatrix lacked testamentary capacity; *second*, because she did not publish or declare the paper to be her will in presence of the subscribing witnesses; *third*, because the paper was the product of undue influence exerted by the nephew, and *fourth*, because it is the product of imposition and fraud upon her.

It appears that when Jonathan was a mere child his aunt took him to her home, and, until he became sixteen or seventeen years of age, supported him and treated him as though he were her own child. From his testimony it seems that prior to 1875 Mrs. Marshall made a will in his favor. There can be no ques-

tion that in his early life she was very fond of him, and that at her death her affection for him had not been entirely extinguished. But it appears that in 1885 he assisted a woman in holding possession of one of her houses against her will and so resisted her efforts to regain her property that he was arrested and incarcerated in jail. After that time he and the aunt did not meet until two days before the disputed paper was signed. That after 1885 he ceased to be the principal object of his aunt's testamentary bounty is evidenced by the fact that in April, 1886, she made a will by which she devised to her husband her dwelling-house and bequeathed to him $800 in cash, and to her brother and Jonathan each $200; that in 1889 she added a codicil to that will by which she revoked the $800 legacy to her husband and gave the east side of her double house to her brother in lieu of his $200 legacy, and provided a legacy of $25 to a grand-niece but did not increase her gift to Jonathan, and that, in the January immediately preceding her death, by a new will then made, she excluded him entirely from her direct bounty.

Early in the winter of 1891 Mrs. Marshall took a severe cold, resulting in an intestinal trouble which caused her intense suffering and so debilitated her that, after lingering about three months, she died. Until the 1st of March, 1892, her physicians did not despair of her recovery, but after that time they were satisfied that their efforts would not avail to save her life, and hence they devoted themselves to relieving her, as far as possible, from pain, by the constant use of narcotics. Every hour opium was administered in some form, and, until she died, she was always, in some degree, under its influence. Early in January, her brother and his wife came from Tuckahoe, where they reside, and settled themselves in her house. Thus, during her illness, the family was made to consist of Mrs. Marshall and her husband and John Hildreth and his wife. The members of the family, assisted by neighbors who volunteered, nursed the sick woman through her illness.

Soon after John Hildreth came, he commenced to talk with his sister, as opportunity offered, about her property and testamentary intentions, and, as he admits, urged his claims upon her

bounty with all the persistency of which he was capable. He went so far, in his eagerness for her property, as to try to induce her attorney to destroy her wills that he might take by inheritance from an intestate sister. William Marshall, the husband, became jealous of the brother's intrusion, and, knowing something of the will of 1886, was fearful lest the brother's influence might be detrimental to him. After a short time the attitude of the two men became so hostile that they came to blows in the bed-chamber of the sick woman, and it was shortly after that difficulty between them that Mrs. Marshall sent for her attorney, Mr. James S. Ware, a reputable member of our bar and a credible witness, and complained to him, repeating his language—

"that she had been bothered a great deal by all parties concerned, in regard to the disposition of her property; that when one side was not at her, the other was, and she wanted to make a will that would satisfy all hands and have the thing over. * * * She then stated to me she wanted to leave her husband and brother as near equally as possible; that was her idea. She said John was very much dissatisfied with her having left him only part of the double house, and that she wanted to leave them as near equally as possible. She stated her husband had been a good husband to her. She thought he was very deserving, yet she still felt she had ties that bound her to her brother. He was poor and old and ought to be taken care of. She directed me to draw a will ordering all of her real estate to be sold. There was no legacy whatever to her nephew Jonathan Hildreth and I mentioned him particularly when she left him out. I said 'You left a legacy in the former will to Jonathan Hildreth, Jr.' She said, 'My legacy to his father will include him; if his father dies he will get part of it, all I care for in regard to him is that he be well and I don't care to leave him anything.'"

The result of this interview was that Mr. Ware drew a will, already referred to, which was executed on the 28th of January, 1892. By it the household furniture of the testatrix is given to her husband, and the entire residue of the estate is devised to Mr. Ware, in trust, to convert it into cash, and, after paying debts and funeral expenses, to pay the grandniece $25, and divide the remainder of the money equally between the husband and brother of the testatrix.

Jonathan Hildreth lived in Philadelphia. On the evening of the 2d of March, 1892, he came to Bridgeton, and later in the

same evening, between nine and ten o'clock, visited his aunt. That night two neighbors, a Mrs. Sawyer and a Mrs. Garten, attended the sick woman. The testimony of these two women, supplemented by that of Jonathan, so far as it may be entitled to credit, leaves very little doubt as to what occurred between the aunt and the nephew during the night. When he entered the bed-chamber, one of the women told his aunt that he was there, and she drowsily replied that she would like to see him, but was too sleepy to talk to him then; to give him a cup of coffee and make him a bed on the sofa, and keep him so that she could talk with him. At three o'clock the next morning she aroused from her sleep and he entered her room, and she bade him sit by her bed, and taking his hand asked him why he had not been to see her before. He replied that he thought it was better for him to stay away and not worry her. She said that she was glad he had come; that she wanted to see him about burying her; that she wanted to be buried in the old Presbyterian burying-ground, beside her brother Joseph and others, whom she named, who were buried there; that she had been at the graveyard to see the place, and found that there was room for her grave beside that of her brother Joseph. She spoke also of the undertaker and of her tombstone. To that which she said Jonathan replied that he could not do anything unless he could have "something to show," and she replied, "I will sign it; I am not able to sit up, but I can make my mark." She told him to draw it up. Nothing was said in the conversation about a will. The conversation thus stated, because of Mrs. Marshall's extremely feeble condition and the effect of the narcotics that she was constantly taking, lasted about two hours before it could be completed.

Jonathan alone states that at that conversation his aunt expressed dissatisfaction with her former wills and instructed him to have a new will prepared which would give him her entire estate. He is not supported in this by either of the women present, and when it is remembered that the conversation was had in the stillness of the night in a room where the two women were present, where every word uttered by the sick woman was

heard, and it is considered that the two women present narrate so particularly and correctly that which was said, it is hardly credible that so important a statement as that which Jonathan asserts could have escaped their attention. They expressly say that they heard no mention made of a will.

Later the same day Jonathan called upon a lawyer and took from him instructions as to the formal shape of a will that he proposed to make. The lawyer did not draw the will. Jonathan explains that the reason was that the lawyer agreed " to take the case and handle it in court." Whatever the real reason may have been the fact was that after a memorandum of the will had been made in legal form the lawyer took Jonathan and introduced him to a stonecutter named E. Mulford Applegate, who was also a justice of the peace, and Jonathan gave Applegate the memorandum and paid him $1 to draw or copy the will from it. The will was drawn on the night of the 3d of March, and Jonathan requested Mr. Applegate to go with him that night to Mrs. Marshall's house and witness its execution but Applegate refused. He explains that he refused because he did not want to go out that night. The next day it appears that Jonathan had the will in his possession and carried it to a barber shop, where he asked one of the barbers to sign Mrs. Marshall's name to it, and, upon the barber refusing, he explained that the signature would not avail until her mark should be added. The night of March 4th Jonathan again went to Applegate to get him to witness the will and Applegate again refused, pleading another engagement, but he was at last prevailed upon to go. A young physician named Thompson was at his house and he was taken along as the second witness. Neither Thompson nor Applegate had previous acquaintance with Mrs. Marshall. When the party reached Mrs. Marshall's house a woman named Griner was in the bed-room where Mrs. Marshall lay, and Mrs. Ella Hildreth, Jonathan's stepmother, was in an adjoining room. By prearrangement John Hildreth, Jonathan's father, had gone to bed, for the purpose, he frankly admits, of inducing William Marshall, the husband, who would never retire before Hildreth, to go to bed and be out of the way.

All the witnesses present agree that when the three men entered Mrs. Marshall's room she roused up and exclaimed, "What does all this mean?" seeming to Applegate and Thompson to be surprised by their coming, Jonathan replied, "Here are these papers to sign," and then entered into conversation with her about burial by a big tree and other matters to which the witnesses did not attend. Mrs. Marshall then said, "If I am going to sign any papers I want to do it now." In his testimony Jonathan states positively that his reply to his aunt's question, as the three men entered the room, "What does this mean?" was, "I brought the men to witness the will," but in this he is not supported by either of the four other persons who were then present. Neither Mr. Applegate nor Dr. Thompson remembers that the word "will" was once used, and both are quite certain that neither Mrs. Marshall nor any other person declared the instrument to be her will while they were in the room. Mrs. Hildreth, who apparently most zealously supports Jonathan, says that she does not remember that the word "will" was used, but distinctly recalls that the word "papers" was used, and Mrs. Griner remembers that Jonathan spoke of "fixing the paper," but she cannot recall that he spoke of a "will."

The pen was held for Mrs. Marshall as she lay upon the bed and she feebly made her mark and sank back drowsily as if under the influence of the narcotics.

Both Jonathan and his stepmother testify that the document was read to Mrs. Marshall an hour and a half before the witnesses came, and Jonathan insists that she understood its contents, but all witnesses agree that there was no reading of the document in the presence of the subscribing witnesses.

In support of the paper Harvey C. Williams, a neighbor, is produced, who says that he spoke to Mrs. Marshall the day after the disputed document was signed, and she then said to him, "I am satisfied in my mind; I have got everything just as I want it;" and John Hildreth also testifies that four or five days after the execution of the disputed paper she likewise expressed herself to him as being then satisfied. It is observed that in neither of these declarations did she refer to having made a will at the

time she signed· the paper for Jonathan, and also that John Hildreth puts the time of the declaration to him either on the day of her death or the day after.

Louisa Fisher, a neighbor, testifies that Mrs. Marshall, some two weeks before her death, spoke to her as if satisfied with her will as it was then made—that is, the will dividing her property equally between her husband and brother.

The physicians who· attended Mrs. Marshall seriously doubt her capacity to make a will at the time when the disputed paper was executed. She was then extremely old and her strength had been wasted by months of suffering and her intelligence was not only impaired by these causes but was also dimmed ·by her continued use of narcotics. The evidence makes it plain that she was constantly either acutely suffering or dull, lethargic or in profound sleep. Yet, with all this, there were moments when she exhibited ability to realize her surroundings and when, apparently, she possessed sufficient testamentary capacity. It is, however, clear, that she did not possess ability to either read or write, and that in order to make her understand properly the most careful explanations should have been made. She was an apt subject for one who had fraudulent designs upon her.

It was in this condition that Jonathan Hildreth found her when she called him to her bedside, and, in the course of two hours, managed to tell him how and where she wished to be buried. It was then that he expressed his inability to carry out her wishes without written authority, and that she told him to write out the· authority and that she would sign it. Then the matter appears to have passed from her mind, for when, forty hours later, Jonathan and the two witnesses entered her room, she roused and asked what their intrusion meant. Jonathan did not then reply that they had come to assist·her in the execution of her will, but he said, "Here are these papers to sign," and then going to her side talked to her of burial, and she said, "If I am going to sign any papers I want to do it now," and the paper in dispute was signed and she sank drowsily back on her bed. Did she suppose the paper to be her will or did she believe that she had merely given her nephew written authority

to bury her according to her wishes?  The inference from the entire transaction is that the latter alternative of this question is the truth; the former is supported by Jonathan and his step-mother only.  The only semblance of proof of the declaration of the will by Mrs. Marshall is in the statement of Jonathan, that in answer to her question, "What does this mean?" he replied, "I got these men to witness the will," and then, after conversation, she made her mark to the paper that he presented.

If Jonathan's testimony be true, and a will was produced at the time, and, understanding its character and contents, she signed it, I think that the declaration was a sufficient compliance with the statute, for its form is immaterial if enough is said and done by the testatrix or in her presence, with her assent, to give the witnesses to distinctly understand that she desires them to know that the paper produced is her will.  Her intelligent execution of the will after such a declaration is an acquiescence in it and assent to it.  *Robbins* v. *Robbins, 5 Dick. Ch. Rep. 742;* *Darnell* v. *Buzby, 5 Dick. Ch. Rep. 725.*

Jonathan is supported by the regularity of the attestation clause, which makes *prima facie* proof of the facts it recites (*Darnell* v. *Buzby, supra*), and I do not think that the vague uncertainty of the testimony of the subscribing witnesses is sufficient to overcome the *prima facie* proof of declaration thus made.  It is better that it should not be permitted to do so.  The language of Lord Penzance, in *Wright* v. *Rogers, L. R., 1 P. & D. 678*, is to be remembered: "The court ought to have in all cases the strongest evidence before it believes that a will with a perfect attestation clause and signed by the testator was not duly executed; otherwise the greatest uncertainty would prevail in proving wills.  The presumption at law is largely in favor of the due execution of the will, and in that light a perfect attestation clause is a most important element of proof."

I think that this case can be justly disposed of upon another ground.  But before I reach that ground, I dismiss the suggestion that the will was the product of undue influence, because I do not think that Jonathan could have unduly influenced the execution of a will under the eyes of Mrs. Sawyer and Mrs.

Garten, or the subscribing witnesses and Mrs. Griner, without their observation of the fact, and I find nothing in their testimony to indicate that he resorted in any way to any species of mental or physical coercion which would constrain his aunt to do that which she would not have done if she had been left to herself. I am constrained rather to believe that the will was a fraudulent imposition upon her, as has been intimated in the question already put as to whether she considered it to be a will or a mere written authority to bury her, and to put my decision of the case upon that ground.

It is remembered, as I have already suggested, that when the will was executed the testatrix was virtually *in extremis*. Her physicians had given up all hope of saving her life and were simply administering to relieve her sufferings. She was unable to rise in her bed. When not under the influence of opium she was in agony, and when under its effect was lethargic, drowsy or asleep. She was so debilitated that she could neither read nor write. It was in this condition that she executed the questioned document, which not only abandons previous testamentary intentions, but substantially ignores the claims of both husband and brother.

When such a person makes a will the legal presumption will not be in favor of the instrument, but the person who propounds it for probate must show by clear and convincing proof not only that the document was read to her but that she fully understood its character and contents. *Den* v. *Johnson, 2 South. 454, 456; Harrison* v. *Rowan, 3 Wash. Cir. Ct. Rep. 580; Day* v. *Day, 2 Gr. Ch. 549; Collins* v. *Townley, 6 C. E. Gr. 353; Harris* v. *Vanderveer, 6 C. E. Gr. 561; Lyons* v. *Van Riper, 11 C. E. Gr. 337; Kahl* v. *Schober, 8 Stew. Eq. 461; Patton* v. *Hope, 10 Stew. Eq. 522.*

Proof that the will in question was read to Mrs. Marshall rests entirely upon the testimony of Jonathan Hildreth and his stepmother. The suspicious circumstance is remembered, that when Mrs. Hildreth first testified in the case she failed to mention the fact that the disputed paper had been read to Mrs. Marshall, though at that time she was asked if Mrs. Marshall knew

Hildreth *v.* Marshall.

that she had signed a will, and she replied in the affirmative, and when asked her reason for saying so she was unable to give it.   It would appear that when she was asked for her reason she could not have escaped reference to such reading—the prior reading of the will—if, in fact, it had ever taken place.   It was not until after Jonathan had sworn to the reading of the will that Mrs. Hildreth was recalled to corroborate his statement. These two persons stand alone in this vital part of the proof, unsupported either by circumstance or the testimony of another witness.

Both are deeply interested in the probate of the paper.   One is the favored legatee and the other is the wife of the father of that legatee.   For months that father had persisted in urging his individual claims upon his sister and had been so successful as to induce her to change a former will and put him upon an equality with her husband.   Not content with that, he confesses a willingness to perpetrate a fraud upon his sister by endeavoring to persuade her lawyer to destroy her wills that he might take as heir-at-law.   Failing in that he manifested a willingness to lose the provision made for him by his sister that his son may have all, and actually aided that son in securing the disputed instrument by resorting to a trick to prevent Mr. Marshall's interference. Evidently he was conversant with the whole matter which Jonathan so diligently supervised.   Jonathan conducted every step in the proceeding.   After his conversation with his aunt he consulted a lawyer, so that the document he would prepare would be in legal form, and then, anticipating litigation, engaged that lawyer to represent him in the contest which he thought would arise when the proposed will should be offered for probate. That his conduct was either suspicious to the lawyer or patently vicious is evidenced by the fact that the lawyer refused to draw the will, and, saving himself, took Jonathan by night to a stone-cutter, who was a justice of the peace and scrivener, where, for a dollar, paid by Jonathan, the document was either drawn or copied.   That night, for some reason, the scrivener shrank from becoming a witness to the execution of the paper, and the next night went only with reluctance under Jonathan's importunity.

When the three men entered the dying woman's room she asked what their coming meant, and it was answered that *"papers"* were to be signed; and then, after Jonathan had talked privately with her about burial by a big tree, as if continuing the conversation of the previous night, the paper he produced was executed.

It is impossible for me, under these circumstances, to resist the inference that fraud was perpetrated, and I am constrained to believe, as I have already said, that Mrs. Marshall thought that that which she signed was merely authority for Jonathan to bury her. The testimony of Mr. Williams that Mrs. Marshall told him on the 5th of March that she was satisfied and had everything as she wished it is consistent with the inference. Her anxiety was about the place of her burial, and she communicated her wishes to her nephew and equipped him with authority, as she thought, to carry them out, and had his promise that her wishes should be executed.

But, be this inference correct or incorrect, I am clearly of opinion that the will should not be admitted to probate upon the evidence which is before me.

It is impossible to rely upon the testimony of the Hildreths. Their conduct is replete with the *indicia* of fraud and falsehood. Rejecting it, it nowhere appears that Mrs. Marshall knew the character or contents of the paper she signed.

I will affirm the decree of the orphans court.