825 A.2d 1209

IN THE MATTER OF THE PROBATE OF THE LAST WILL AND TESTAMENT OF ANNA VILLONE CATELLI,THOMAS R. VILLONE, EXECUTOR OF THE ESTATE OF ANNA ROSE CATELLI AND TRUSTEE OF THE ANNA ROSE CATELLI TRUST, AND THOMAS R. VILLONE, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. GEORGE G. VILLONE AND EXCELSIOR REALTY, LTD., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 22, 2003—Decided July 1, 2003.

Before Judges PRESSLER, CIANCIA and HOENS.

*Albert L. Cohn* argued the cause for appellant, *Thomas R. Villone,* Executor of the Estate of *Anna Rose Catelli* and Trustee of the *Anna Rose Catelli Trust,* and *Thomas R. Villone,* individually (*Cohn, Lifland, Pearlman, Herrmann & Knopf,* attorneys; *Mr. Cohn,* of counsel, and on the brief; *Audra DePaolo,* on the brief).

*Dennis G. Harraka* argued the cause for respondents, *George G. Villone* and *Excelsior Realty, Ltd.* (*Ferrara, Turitz, Harraka &*

*Goldberg,* attorneys; *Mr. Harraka and Lina Papalia Corriston,* on the brief).

The opinion of the court was delivered by

HOENS, J.A.D.

Thomas R. Villone was named by his elderly aunt, Anna Villone Catelli, as the executor in a will and as the trustee under a living trust which she executed on January 9, 1996. He appeals from the decision of the Chancery Division which refused to admit that 1996 will to probate, which named his cousin, George Villone, as the Administrator C.T.A. of Catelli's estate, which ordered him to restore assets to the estate, which awarded counsel fees and which dismissed a related complaint that he had filed in his effort to enforce certain provisions of the 1996 trust.

The decision of the trial court was made following two days of testimony and the consideration by the court of deposition testimony given by witnesses, including Thomas Villone, who could not appear in New Jersey. In that decision, the court first held that, as a matter of public policy, the will could not be admitted to probate because at the time of the execution of the 1996 will, Anna Catelli had become blind and the only person who could verify that the contents of the documents had been read to her so that she knew what she was signing was Thomas, who the disputed documents made her sole heir. As an alternate ground, the judge analyzed the testimony and the evidence in the nature of an application for a directed verdict at the close of the plaintiff's case and determined that Thomas Villone could not prevail on the merits. Because we affirm the decision of the court based upon the alternate ground, we do not address the court's public policy rationale.

Viewed in the light most favorable to Thomas Villone, the record discloses the following facts. The testator, Anna Catelli, was a widow who had no children and who lived alone. She had a number of nieces and nephews, including Thomas Villone and George Villone. She also had a brother, Robert, who died in

Florida in 1994. Robert had named Thomas, his nephew, as the executor and principal beneficiary of his estate. Thomas, who was a self-employed long distance truck driver living in Arizona, had not had much contact with Anna Catelli, but telephoned to tell her of her brother's death. In that conversation, Catelli had asked him to come and visit her when he was next in New Jersey and he thereafter did so.

Early in 1994, while Thomas was visiting her at her home, then in Springfield, Catelli asked him to drive her to her lawyer's office in Maplewood which he did. He learned that day that Catelli had named him as her alternate power of attorney in the event that her long-time physician and confidante, Dr. Coppola, was unable to serve. While he was not aware of it at the time, she had gone to the lawyer's office that day to execute a will that left her estate to a variety of relatives and friends and to two churches and which included him as one of the residuary beneficiaries. Later that year, Catelli suffered a significant stroke which left her partially paralyzed and with limited powers of speech and sight. She was moved by Dr. Coppola to a nursing home, and thereafter to the Garden Terrace Nursing Home where she remained until her death. Thomas visited her at the nursing home from time to time when he was in New Jersey. Shortly before Thanksgiving 1995, Dr. Coppola telephoned Thomas and told him that Catelli wanted to make him her sole heir. Dr. Coppola died two or three days later.

Following Dr. Coppola's death, Thomas invoked the power of attorney to make $10,000 gifts to himself, his wife and his daughter. He next received from Dr. Coppola's son all of the papers relating to Catelli's assets. While Thomas then knew that the designation of him as the sole heir was a departure from her earlier will, he did not discuss this apparent change of plans with Catelli. Rather, he immediately consulted an attorney in Arizona who prepared a living trust, which named Thomas as the trustee, and a pour-over will which named Thomas as the executor and sole heir. The Arizona attorney gave the documents to Thomas

along with a letter which instructed him to have the documents reviewed by a New Jersey attorney and which suggested that Anna be represented by independent counsel. Thomas then came to New Jersey, arriving on January 6, 1996. While Thomas knew that Catelli had been represented in the past by the lawyer in Maplewood, he did not contact him and did not consult with any other New Jersey lawyer. Instead, he went directly to the nursing home and visited with Catelli.

Over the course of the next three days, while she remained in her bed and dozed on and off, he read the documents to her. Thomas has a high school education and concedes that he would not have been able to explain or interpret any of the language of the trust or the will to Catelli. He was aware that the trust and the will together would enable him to avoid probate, but he did not understand why that might be advantageous. At no time did he suggest that Catelli consult with an attorney or offer to contact her New Jersey lawyer for her.

After three days, Thomas made arrangements with the administrator of the nursing home to execute the trust and the will. The administrator served as a notary and two nurses observed Catelli place an "X" on the line Thomas indicated. Shortly after the execution, Thomas gave up his truck driving job, employed himself as the full-time manager of Catelli's assets and undertook to gain control of Catelli's interest in Excelsior Realty Ltd. (Excelsior), a family real estate venture, through the trust instrument. Prior to Catelli's death, Thomas' efforts to gain control of her interest in Excelsior consisted of correspondence with his cousin George Villone who was the General Partner of that venture. George Villone refused to acknowledge the validity of the January 9, 1996 trust agreement and refused to turn control of Catelli's interest in Excelsior over to Thomas. He continued to refuse after Catelli's death on July 5, 1997. As a result, in March 1999, Thomas instituted litigation, in his capacity as the executor of Catelli's estate and as her heir, against George Villone and Excelsior to force a transfer of Catelli's interest to him. That complaint was

consolidated with the action filed subsequently by Thomas in the Chancery Division, Probate Part seeking to have the disputed will admitted to probate.

The judge elected to first receive evidence relating to whether the 1996 will should be admitted to probate. At the close of the evidence offered in favor of the admission of the will, the trial court held, first, that Thomas Villone had failed to demonstrate that Catelli knew the contents of the documents that she had signed. Relying on *Harris v. Vanderveer's Executor*, 21 *N.J. Eq.* 561, 563 (E. & A. 1870), *Hildreth v. Marshall*, 51 *N.J. Eq.* 241, 250, 27 *A.* 465 (Prerog.Ct.1893) and *Day v. Day*, 3 *N.J. Eq.* 549, 553–55 (Prerog.Ct.1831), the judge rejected the will. While each of these decisions includes a discussion of the effect of visual impairment on the knowing execution of a will, each of them arose in the context of a dispute based on allegations of undue influence. Thus, while each of these precedents rejected a proffered will executed by a testator with a significant visual or other impairment, none requires proof of knowing execution beyond that specified by the statute. *N.J.S.A.* 3B:3–2; *N.J.S.A.* 3B:3–4. The judge, however, reasoned that although the will had been executed in accordance with the statutory formalities, public policy demands proof beyond compliance with the formalities of execution if the testator can no longer see. He held that the will was invalid because there was no evidence from anyone other than the sole beneficiary that the will had been read to Catelli and that she knew what she was signing. He therefore created an additional requirement for probate of a will executed by a visually impaired person, citing public policy.

We appreciate the trial judge's concern that a testatrix with a severe visual impairment is ordinarily unable, without the intervention of a neutral person, to determine if the will as drafted accurately memorializes her testamentary instructions. The same, of course, is true of a testator who cannot read by reason of illiteracy. But whether the statutory provisions for the witnessing and execution of the wills of such testators should be augmented

to require that the pre-execution reading of the will to the testator be by a disinterested person is, in our view, a matter within the province of the Legislature. We are satisfied, at least in this case, that we need not further consider that issue because, as the judge found, this record speaks so clearly of undue influence.

The trial judge addressed the alternate ground of undue influence using the standard of a directed verdict at the close of plaintiff's proofs. *R.* 4:37-2(b). He found that there was a confidential relationship between the decedent and the beneficiary, that there were suspicious circumstances surrounding the execution, that undue influence was therefore presumed, that the burden to overcome the presumption therefore shifted to Thomas and that the record before the court made it impossible for him to carry that burden. He therefore refused to admit the will to probate, dismissed the complaint against George Villone and Excelsior, admitted Catelli's 1994 will to probate, appointed George Villone as the Administrator C.T.A., directed Thomas to restore assets to the estate and approved fees and commissions. We agree with the judge's alternate analysis of the probate dispute and we affirm on that ground.

Viewed in terms of undue influence, there can be no doubt about the issues before us. The judge identified several factors that supported his analysis of undue influence, including the fact that Thomas retained his own attorney to prepare the documents, that he did so based only on the conversation with Dr. Coppola and without any consultation with Catelli herself, that the documents were markedly different from Catelli's prior will, that Catelli was very debilitated and vulnerable, that the effect of the documents was an immediate vesting of control of all assets in Thomas through the *inter vivos* trust document, and that Thomas immediately upon the death of Dr. Coppola left his employment and by means of the power of attorney began to pay himself a commission and dispensed substantial gifts to himself and his immediate family, which bespoke self-dealing even prior to the time of the execution of the disputed documents.

We concur with the judge's analysis of the effect of these facts. First, Catelli was clearly not well. The nursing administrator who saw her daily conceded that, while she had made progress in recovering from her stroke, her level of functioning was seriously diminished. Her short-term memory was significantly impaired. Her vision had deteriorated substantially. She required total care by the staff at the nursing home, needing daily assistance with feeding, bathing, and other basic needs. During the three days prior to the execution of the document, she did not leave her room, but remained in bed, dozing from time to time and barely communicating with anyone. While she was undoubtedly fond of Thomas, who was virtually her only visitor after the death of Dr. Coppola, she was especially vulnerable to his influence.

Moreover, Thomas acted in a manner which made his intentions clear. Even accepting as true his testimony that he learned from Dr. Coppola that Catelli intended to make him her sole heir, his behavior proves that he acted so as to overbear her will. He made no effort to discuss Catelli's intentions with her prior to acting for his unilateral benefit. He knew that Catelli had an attorney in New Jersey who had prepared at least one earlier will, but he deprived Catelli of the opportunity to consult with him. He did so in spite of the urging of his personal attorney from Arizona to have the documents reviewed by New Jersey counsel and to give Catelli the benefit of independent legal advice. He knew as well that the 1994 will left significant assets to the two churches and a hospital, left numerous specific bequests to friends and to a few family members, and included him only as one of the residuary beneficiaries. Nonetheless, he made no effort to discuss with Catelli why all were to be rejected in favor of him alone.

Nor did he simply carry out the instruction that he be made her sole heir. Instead, he used his own attorney to secure immediate control of her assets. He knew that Catelli had not previously utilized a trust and he knew from his own lawyer that a living trust with a pour-over will would give him control before Catelli died. In fact as soon as he had the ability to exercise any control

through the power of attorney, he gave $30,000 in gifts to himself, his wife and his daughter, an act well in excess of any prior expression of generosity by Catelli and not one she authorized. Shortly thereafter, he embarked on a new career, hiring himself to be the full time manager of her assets, in spite of his lack of any relevant training or experience. Those acts are the behavior not of one with Catelli's interests at heart, but of one bent on his own enrichment at her expense.

The law governing undue influence is well established. While we generally presume that the testator is of sound mind and competent to execute a will, *Gellert v. Livingston*, 5 *N.J.* 65, 71, 73 *A.*2d 916 (1950), even a will which on its face appears to have been validly executed can be overturned upon a demonstration of undue influence. *Haynes v. First Nat'l State Bank*, 87 *N.J.* 163, 175–76, 432 *A.*2d 890 (1981). Similarly, an *inter vivos* transfer, as was this trust, is equally governed by the undue influence analysis. *In re Dodge*, 50 *N.J.* 192, 227–29, 234 *A.*2d 65 (1967); *see Pascale v. Pascale*, 113 *N.J.* 20, 29–31, 549 *A.*2d 782 (1988). Undue influence is "defined as 'mental, moral or physical' exertion which has destroyed the 'free agency of a testator' by preventing the testator 'from following the dictates of his own mind and will and accepting instead the domination and influence of another.'" *Haynes v. First Nat'l State Bank, supra*, 87 *N.J.* at 176, 432 *A.*2d 890 (quoting *In re Neuman*, 133 *N.J. Eq.* 532, 534, 32 *A.*2d 826 (E. & A.1943)). Where the will benefits one who enjoyed a confidential relationship with the testator, and where there are suspicious circumstances surrounding the will, the law presumes undue influence and the burden is upon the proponent of the will to disprove the presumption. *In re Rittenhouse's Will*, 19 *N.J.* 376, 378–79, 117 *A.*2d 401 (1955).

The confidential relationship between Thomas and Catelli is both plain and conceded. *See Haynes v. First Nat'l State Bank, supra*, 87 *N.J.* at 176, 432 *A.*2d 890; *In re Estate of Hopper*, 9 *N.J.* 280, 282, 88 *A.*2d 193 (1952). The suspicious circumstances surrounding the will need only be "slight" to shift the burden of

proof to the proponent to overcome them. *See In re Estate of Lehner*, 70 *N.J.* 434, 436, 360 *A.*2d 383 (1976); *In re Blake's Will*, 21 *N.J.* 50, 55–56, 120 *A.*2d 745 (1956).

Once the burden has shifted, the will proponent must overcome that presumption by a preponderance of the evidence. *Haynes v. First Nat'l State Bank, supra*, 87 *N.J.* at 177–78, 432 *A.*2d 890; *In re Estate of Weeks*, 29 *N.J.Super.* 533, 538–39, 103 *A.*2d 43 (App.Div.1954); *see In re Estate of Churik*, 165 *N.J.Super.* 1, 5, 397 *A.*2d 677 (App.Div.1978), *aff'd o.b.*, 78 *N.J.* 563, 397 *A.*2d 655 (1979). *See also Pascale v. Pascale, supra*, 113 *N.J.* at 31, 549 *A.*2d 782 (holding that donee of *inter vivos* gift bears burden of proof by clear and convincing evidence). The record before us discloses no evidence by which Thomas could meet this burden. On the contrary, the record is overwhelmingly supportive of the finding of undue influence.

The combination of the confidential relationship and the suspicious circumstances was more than sufficient to shift the burden to Thomas. The absence of any evidence tending to negate the presumption and the abundant evidence of self-dealing by Thomas support the conclusion that the testator's will was overborne. The trial judge, having heard and considered the evidence, appropriately found that the burden that had shifted to Thomas was one that he was unable to carry.

Affirmed.