IN THE MATTER OF
DONALD C. CHASE, AN ATTORNEY AT LAW.

Argued September 9, 1975—Decided October 14, 1975.

*Mr. J. Albert Mastro* argued the cause for Somerset County Ethics Committee.

*Mr. William E. Ozzard* argued the cause for respondent.

PER CURIAM. The Somerset County Ethics Committee, after hearing, presents its complaint against respondent for violation of DR 5–105(C) in that he improperly represented two of his clients in a loan transaction between them, thereby placing himself in an unethical conflict of interests situation.

The testimony at the hearing justifies the following findings of fact. A Mrs. Audrey Warner, having won a New Jersey State Lottery in early 1973 entitling her to $50,000 per year for 20 years, went to respondent for advice as to investing the funds to be received. Respondent's firm had represented her and her husband in other matters. At first respondent explored the possibilities of creating a substantial capital fund by borrowing against the anticipated future income. Expecting success, respondent drew an irrevocable trust agreement calling for division of the trust estate into seven equal shares, income payable to the Warners and their five grandchildren, respectively, for stated periods of time. Respondent was made sole trustee and given plenary invest-

ment powers. Although Mrs. Warner signed the agreement as "settlor", the trust was treated as "dead" after respondent determined that the capitalization plan was not feasible.

Nevertheless, Mrs. Warner turned over to respondent for investment 39,000 of the initial $50,000 installment of the lottery prize which she received in April 1973. She and her husband testified it was understood this was to be invested in a Holiday Inn then being constructed on Rt. 22. Respondent denied this, saying the investment was to be left to his sound discretion, the only understanding being that the investment should be "safe" and bring a "good return". This factual conflict need not be resolved, as the determination of this matter does not depend on it.

Respondent placed the funds in his attorney's trust account and on June 14, 1973 advanced the $39,000 as a loan to a trucking concern owned by a long-standing client of his, one F. C. Bruno. He received from Bruno a demand promissory note payable to the Warners calling for $9\frac{1}{4}$ percent interest. Although Bruno also executed a mortgage (behind two prior mortgages) on his home, the name of the mortgagee was never filled in and the instrument was not recorded. Nor was any search made on the property. No other security was exacted from the borrower at or subsequent to the delivery of the loaned funds. Bruno's net assets at the time, according to his accountant, were worth about $95,000.

When the Bruno loan was made the Warners were not informed as to the identity of the borrower or that he was a client of respondent. They apparently were informed only that they would receive payments of about $600 per month. They actually received $625.48 twice, once in August 1973, the other in September 1973. These payments, under the arrangement between Bruno and respondent, represented, as to the first payment, two months interest of $601.86 and $26.22 for principal, while the second payment constituted $300.42 for interest and $327.06 for principal. These checks were drawn on the respondent's trust account. Only the second bore a reference to "Bruno". The Warners complained

about the delay in the payments, and then, for the first time, in October 1973, respondent told them the loan was to his client Bruno. They promptly demanded the return of their money. Repayments of $7,000 and $5,000 were made before November 5, 1973. After their inability to get satisfaction from respondent for the balance due, the intercession of another attorney, and the filing of a complaint with the ethics committee, respondent ultimately (in February 1974) made good the whole principal balance together with interest at 9¼ percent. Respondent's delay in restoring the funds was partly attributable to his critical domestic difficulties at the time and partly to the need to find refinancing for the Bruno loan.

Notwithstanding respondent's efforts to justify his conduct in lending the money of one client to another without informing the former of the relationships and making the disclosure called for by DR 5–105(C),[1] those efforts must fail.

Respondent urges he was given carte blanche to make any safe investment he chose, and that he had every reason to believe that an unsecured loan to Bruno was safe, based on his knowledge of Bruno's reliability and financial standing. This misses the point of the disciplinary rule entirely, and it is surprising to us that any lawyer of experience would not so understand, having in mind that the substance of the rule was contained in Canon 6 of the former Canons of Pro-

---

[1]DR 5–105(A) requires a lawyer to decline employment if the exercise of his independent professional judgment in behalf of a client will or may be adversely affected by such employment, except as allowed under (C). Paragraph (B) of the rule proscribes continuance of multiple employment in the same circumstances. Paragraph (C) reads:

(C) In situations covered by DR 5–105(A) and (B) except as prohibited by rule, opinion, directive or statute, a lawyer may represent multiple clients if he believes that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the facts and of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

fessional Ethics and that the principles involved were thoroughly expounded by this court as long ago as the decisions in *In re Greenberg,* 21 *N. J.* 213, 221 (1956) and *In re Kamp,* 40 *N. J.* 588, 595–596 (1963), recently reiterated in *In re Lanza,* 65 *N. J.* 347 (1974), and are or should be practically self-demonstrative to any conscientious attorney. There is nothing novel about the ethical dilemma dealt with by DR 5–105. A lawyer cannot serve two masters in the same subject matter if their interests are or may became actually or potentially in conflict. A lawyer in such circumstances must be conscious that he acts as an attorney, a wholly trusted advisor and an advocate for each of his clients.

Respondent candidly admitted that he was in a lawyer-client relationship with both Mrs. Warner and Bruno in negotiating this loan. He owed each full fidelity and his best efforts in achieving the most favorable terms possible, free from any influence militating toward a dilution of that obligation. Yet conflicting interests were inherently involved with respect to such terms and conditions as identity and financial responsibility of borrower, period of loan, repayment of principal and interest, rate of interest, and, of crucial importance in these circumstances, the nature and adequacy of security. Respondent was in violation of paragraph (C) in that he could not reasonably believe that he could "adequately represent the interests of each" and further, even if he thought he could, in that he did not obtain Mrs. Warner's consent to the multiple representation after disclosure to her of the facts bearing upon the "possible effect" of his representation of both parties "on the exercise of his independent professional judgment on behalf of each". *In re Lanza, supra,* 65 *N. J.,* at 351.

Dual representation here not only presented the possibility of adverse effect on the terms of the loan in respect of Mrs. Warner's interests, but also produced the actuality of prejudice at least in that respondent's original professional judgment that adequate security should be obtained was

never followed by the proper effectuation of such security. Moreover, respondent's diligence as the collecting agent for the lender on the loan was potentially diluted by his continuing and apparently beneficial relationship with the borrower as a client. Finally, undiluted consideration of Mrs. Warner's interests alone might well have influenced a decision not to lend such a sum to a small trucking firm.

The circumstance of the rare situation where multiple representation presents no risk of conflict, as contemplated in DR5–105(C), requires, as noted, at least a full disclosure to all so represented, in which duty respondent was remiss. The fortuitously benign outcome of the business in which respondent's dereliction occurred is not relevant to the principle involved. Had the transaction ultimately caused the Warners financial loss, respondent's professional career would have trembled in the shadow of disbarment or suspension. This grave risk should impress him and others with the implications of the sanction herewith imposed.

■ Respondent's further contention that the word "representation" in paragraph (C) contemplates only "a legal controversy between multiple clients" is wholly without merit. Representation in this context contemplates all the ways in which an attorney can or does act for others, whether in matters of law, business or otherwise. *Cf. In re Carlsen,* 17 *N. J.* 338, 345–346, 348 (1955). Advice and representation in relation to investments are commonly sought of and afforded by lawyers to laymen. The activity here was squarely within both the letter and the spirit of the rule.

In determining sanctions the Court has considered respondent's unblemished record to date. Nevertheless, for his plain and patent violation of DR 5–105(C), respondent must be and is herewith severely reprimanded.

*For reprimand*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.