IN THE MATTER OF JACK KRAKAUER, AN ATTORNEY AT LAW.

Argued April 3, 1979—Decided July 25, 1979.

*Mr. Dickinson R. Debevoise*, Chairman, argued the cause for Disciplinary Review Board.

*Mr. Jay D. Fischer* argued the cause for respondent (*Messrs. Fischer, Kagen, Klein, Giampapa* and *Miller*, attorneys).

PER CURIAM.

Respondent has been found guilty of a number of charges of unethical conduct by the Disciplinary Review Board. Because the facts which formed the basis for the conclusions reached by the Board are extremely complicated, we have sought to extract and set forth below only those events which bear significantly upon the result we reach.

█ Two procedural points deserve brief mention. The person who filed the complaint before the District Ethics Committee was not present at the hearings before that body, having apparently left the jurisdiction for parts unknown. Respondent moved to dismiss the complaint because of complainant's absence. The motion was properly denied. It is not necessary that a complainant appear before an Ethics Committee. Complaints that should be and are pressed against respondents sometimes reach the Committee from anonymous sources or result from information to which a committee member becomes privy in some accidental way. Normally, of course, the complainant appears and testifies but there is no jurisdictional requirement that this occur.

█ Secondly, respondent took exception to the fact that the attorney who presented the matter to the Ethics Committee also

represented the complainant and his wife in a civil action against respondent. This attorney was chosen by the Committee because of his comprehensive knowledge of the intricate factual background of the matter. It would have been sounder procedure to have had the choice of the presenter first approved by the Assignment Judge pursuant to R. 1:20–2(*I*)(1)(i), but here there is no suspicion of prejudice. Again, the motion to dismiss was properly denied.

We turn now to the facts of the case. In early 1974, Carlo Corporation, owned by complainant Carlos de la Fuente and his wife, purchased the assets, good will and liquor license of a restaurant business in the City of Passaic. At the same time Mr. and Mrs. de la Fuente leased the portion of the building in which the restaurant was located. Both the seller of the business and the landlord of the property were corporations owned or controlled by one Joseph Lipari. The purchase price largely took the form of a series of promissory notes secured by a purchase money security agreement on the tangible assets of the restaurant and a pledge of the stock of Carlo Corporation. These were assigned by Lipari to one Mae Chiaramonte in whose favor there was endorsed a "loss payable" clause on the fire policy covering the secured assets.

Throughout these transactions, respondent represented Lipari. Mr. and Mrs. de la Fuente were represented by other counsel.

On June 30, 1974, a fire substantially destroyed the restaurant premises rendering them unusable. Immediately after the fire, the de la Fuentes communicated with respondent. He undertook to act for them in settling the fire loss and in arranging, with the consent of Mae Chiaramonte, to use the insurance proceeds which she would receive for the loss of personal property, to reconstruct the building. As part of this arrangement it was understood that Mr. and Mrs. de la Fuente would somehow manage to purchase the property. This arrangement was never reduced to writing.

Respondent retained a firm of commercial fire insurance adjusters, Sarasohn & Co., to adjust the claim with the insurer. Their commission would be 10% of any recovery. With the consent of the de la Fuentes, respondent agreed with Sarasohn & Co. that he would be paid one-half of this commission. He described this as the "normal" arrangement. Respondent testified that he performed legal services in connection with the fire loss and that his share of the adjuster's commission represented his legal fee for these services. This arrangement, also, was never reduced to writing.

It had been apparent from the start that the de la Fuentes would need financial assistance of about $50,000 in order to effect the purchase of the property. Respondent agreed to endeavor to negotiate the necessary mortgage loan for a 10% commission. While this agreement was never set forth in any writing, it was understood that the commission would become payable only if the loan were to be arranged through some outside source; if financing were to take the form of a purchase money mortgage in favor of the seller, Lipari, no commission would be payable.

Meanwhile, negotiations proposing a kind of joint venture went forward among the de la Fuentes and two families named Echevarria and Perez. Eventually it was agreed that the de la Fuentes, the Echevarrias and the Perezes would each receive a one-third interest in the venture. Respondent prepared a written agreement setting forth the details of the undertaking, but it was never executed. The unsigned agreement contained a provision that each family was to make an initial payment of $3,000 to a corporation which respondent was to form and which was to take title to the realty. From each of these payments of $3,000 respondent was authorized to receive the sum of $1,000 for legal fees. He received a $3,000 payment from Echevarria and a like amount from Perez. He paid $2,000 of these funds as a down payment to the selling corporation—owned by Lipari—and applied $1,000 on account of his legal fees. The Echevarria

check was returned for insufficient funds but the Perez check cleared.

At more or less the same time respondent received checks from the insurer totaling $30,000, which were circulated for endorsement. Upon their return they were deposited in respondent's trust account. He drew from them to pay certain expenses incurred in reconstructing the property.

On October 9, 1974 respondent paid his own firm $5,000 from these funds allegedly representing his fee for procuring the necessary financing. He had not at that time arranged for outside financing and in fact never did. On October 15, 1974 he paid Sarasohn & Co. $1,500 representing one-half the commission for adjusting the fire loss, and paid his firm a like amount as his share of the commission.

The de la Fuentes, in the following month, having become disenchanted with respondent's actions on their behalf, sought an accounting. Respondent prepared and submitted a rough, handwritten statement. The Disciplinary Review Board decided that all expenditures set forth in the statement were justified, but also concluded that at that time respondent had every intention of keeping the $5,000 commission he had taken but had not earned.

By December 9, 1974, the closing date for the sale of the property, it had become apparent that the de la Fuente-Echevarria-Perez venture was no longer viable. The de la Fuentes alone would have to purchase the property. Respondent had been unable to obtain outside financing but, unbeknownst to the de la Fuentes, he had arranged with Lipari to accept a $53,000 six and one-half year purchase money mortgage with interest at 18%. For this Lipari received a premium of $1,500, although respondent did not reveal this until his clients had retained new counsel.

The closing took place December 9, 1974. The de la Fuentes took title in the name of a corporation respondent had incorporated for them named Nylo Corp. The $53,000 mortgage was

drawn in favor of Iplam, Inc. . The de la Fuentes had no
knowledge that this corporation was owned by Lipari. They
apparently thought it was an outside lender and that hence
respondent had earned his commission. Respondent's statement
for services and disbursements submitted at the closing included
a disbursement of $560 for title insurance premium and title
work.

Shortly after the closing the de la Fuentes retained new
counsel, Michael K. Diamond, Esq. Mr. Diamond reviewed the
various documents and wrote respondent seeking further infor-
mation and challenging several aspects of the transaction.
Through independent investigation Mr. Diamond learned the
following: (1) Respondent had requested a title search in De-
cember, *1973,* a year before the transaction in question, at a
time when he was representing Lipari. He had not done so in
connection with the transfer of title to Nylo Corp. Specifically
he had not requested the binder or title policy for which he had
billed the de la Fuentes; (2) The charter of the corporation from
which the de la Fuentes purchased the restaurant business in
1974 had been forfeited in 1971; (3) Iplam, Inc., the mortgagee,
had been formed by respondent December 12, 1974, three days
after the December 9 closing; (4) Nylo Corp. had also been
formed December 12; and (5) The corporation which sold the
property to Nylo Corp. had forfeited its charter for nonpayment
of taxes about six months before the closing.

In writing to Mr. Diamond in January, 1975, respondent still
claimed he was entitled to retain the $5,000 commission. At
about the same time he returned the $3,000 to Perez' attorney,
claiming, however, that this should be a charge against the de la
Fuentes. He later changed his position and said he never
intended to keep the $5,000.

Respondent did cure all the defects mentioned above that had
to do with the December 9, 1974 closing. He also prepared a
new accounting and submitted it to Mr. Diamond. It contradict-
ed many of his earlier assertions. He now for the first time
expressly disclaimed any right to the $5,000 commission.

■ The District Ethics Committee and the Disciplinary Review Board as well concluded that in representing the de la Fuentes in connection with their purchase of the property from Lipari, respondent did not render the free and loyal representation to which a client is entitled. A significant amount of evidence, which need not be detailed here, taken with that has been already said above, convinces us that respondent maintained a continuing professional relationship with Lipari and his interests. Respondent's conduct in this respect violated *DR* 5–105 as well as *DR* 7–101.

Both the District Ethics Committee and the Disciplinary Review Board concluded that respondent had intended to retain the $5,000 commission, although he himself conceded that it was to have been earned only if outside financing were found. It was apparently due only to the vigorous and effective efforts of Mr. Diamond that he retreated from this position. Respondent's conduct in this respect was a clear violation of *DR* 1–102(A)(4).

The conclusion reached below that respondent acted unethically in his endeavor to collect as an alleged disbursement a charge for a title search which had never been ordered for his client is clearly correct. This is too obvious to require discussion.

We also agree that the several changes in position taken by respondent, the contradictions that appear in various documents as well as in oral testimony, constitute conduct in violation of *DR* 1–102(A)(5) and *DR* 6–102(A).

■ The Disciplinary Review Board has recommended that respondent be suspended from the practice of law for a period of one year and that he be required to reimburse the Administrative Office of the Courts for the actual cost of disbursements for stenographic transcripts arising out of this disciplinary proceeding. We agree.

Respondent is hereby suspended from the practice of law for a period of one year and until the further order of this Court. He is further directed to pay the above mentioned item of disburse-

ments forthwith upon submission of a statement by the Administrative Office of the Courts.  So ordered.

*For  suspension* —Justices  MOUNTAIN,  CLIFFORD, SCHREIBER and HANDLER and Judge HALPERN—5.  ·

*Opposed* —None.

## ORDER

It is ORDERED that JACK KRAKAUER of Passaic be suspended from the practice of law for one year and until the further order of this Court, effective August 13, 1979;  and it is further

ORDERED that JACK KRAKAUER be and hereby is restrained and enjoined from practicing law during the period of' his suspension;  and it is further

ORDERED that respondent comply with all the regulations of the Disciplinary Review Board governing suspended, disbarred and resigned attorneys.