RICHARD D. HAYNES AND CHARLES E. HAYNES, PLAINTIFFS-APPELLANTS, v. FIRST NATIONAL STATE BANK OF NEW JERSEY, TRUSTEE UNDER AN IRREVOCABLE TRUST AGREEMENT DATED JANUARY 16, 1974 AND FIRST NATIONAL STATE BANK OF NEW JERSEY AND DORCAS D. COTSWORTH, TRUSTEES UNDER A REVOCABLE TRUST AGREEMENT DATED JANUARY 15, 1974, DORCAS D. COTSWORTH, INDIVIDUALLY, GAINES BERRY, DORCAS ANN BEATTY, BRUCE BERRY, HOLLY BERRY, DOROTHY WASBERS, PAULINE W. ZINN AND ELIZABETH Z. COMBS, DEFENDANTS-RESPONDENTS, AND TRINITY REFORMED CHURCH, YORK, PENNSYLVANIA, AMERICAN HEART ASSOCIATION, INC., NEW JERSEY ASSOCIATION FOR RETARDED CHILDREN, INC., UNION COUNTY UNIT, YORK COUNTY BLIND CENTER, DEFENDANTS.

Argued February 23, 1981—Decided July 22, 1981.

*Clifford W. Starrett* argued the cause for appellants (*Schenck, Price, Smith & King*, attorneys).

*Elmer J. Bennett* argued the cause for respondents (*Carpenter, Bennett & Morrissey*, attorneys; *Elmer J. Bennett* and *Joel R. Glucksman*, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This is a will contest in which the plaintiffs, two of the decedent's six grandchildren, seek to set aside the probate of their grandmother's will and two related trust agreements. The major issue presented is whether the will is invalid on the grounds of "undue influence" attributable to the fact that the attorney, who advised the testatrix and prepared the testamentary instruments, was also the attorney for the principal beneficiary, the testatrix's daughter, in whom the testatrix had reposed trust, confidence and dependency. A second question concerns the enforceability of a "non-contestability" or *in terrorem* clause in the testamentary documents under New Jersey common law since the decedent died before the effective date of the new probate code, *N.J.S.A.* 3A:2A–32, which invalidates such clauses in wills.

In an unreported opinion upholding the probate of the will and related trusts, the trial court held that the circumstances created a presumption of undue influence but that this presumption had been rebutted by defendants. It ruled further that the *in terrorem* clause was unenforceable. The case was appealed to the Appellate Division, which affirmed the trial court as to the lack of undue influence, sustaining the probate of the will and its judgment upholding the related trust agreements, but disagreed with the trial court's ruling that the *in terrorem* clause

was unenforceable.  Plaintiffs then filed their petition for certification which was granted.  85 *N.J.* 99 (1980).

I

The issues raised by this appeal, particularly whether the contested will was invalid as a result of "undue influence," require a full exposition of the facts.

Mrs. Isabel Dutrow, the testatrix, was the widow of Charles E. Dutrow, an employee of Ralston Purina Co. who had acquired substantial stock in that corporation.  Upon his death the stock, aggregating almost eight million dollars, was distributed to his widow and their two daughters, both outright and in trust.

Betty Haynes, one of the daughters of Charles and Isabel Dutrow, came with her two sons to live with her parents in the Dutrow family home in York, Pennsylvania in 1941 while Betty's husband was in military service during World War II. Following Charles Dutrow's death in 1945 and her own divorce, Betty and her sons continued to live with Mrs. Dutrow in York. The relationships between mother and daughter were extremely close, Mrs. Dutrow having deep affection for Betty, as well as her grandsons whom she practically raised.  The two boys, however, left the York home sometime around 1968 to the considerable aggravation and disappointment of their grandmother.[1]  But Betty remained with her mother until Betty's death in June 1973.

At the time of Betty's death, she had been living with her mother for more than 30 years.  Mrs. Dutrow was then 84 years old and suffered from a number of ailments including glaucoma, cataracts and diverticulitis, and had recently broken her hip. Mrs. Dutrow, distraught over the death of her closest daughter

---

[1]The Haynes children apparently undertook lifestyles which caused both their mother and grandmother great anguish: one son resisted military service and took refuge in Canada during the Vietnam war and both had live-in girlfriends whom they eventually married.

and somewhat alienated from the Haynes children, decided to move in with her younger daughter, Dorcas Cotsworth, and Dorcas' husband, John, who had homes in Short Hills and Bay Head, New Jersey. This decision was a reasonable one, freely made by Mrs. Dutrow, who despite her age, physical condition and feelings of despair was and remained an alert, intelligent and commanding personality until the time of her death.

During her lifetime, Mrs. Dutrow executed a great many wills and trust agreements. All of these instruments, as well as those her husband had executed prior to his death, were prepared by the longstanding family attorney, Richard Stevens, of Philadelphia. By June 1967 Stevens had prepared five wills and several codicils for Mrs. Dutrow.

As of the time she moved in with the Cotsworths, Mrs. Dutrow's estate plan reflected a basic disposition to treat the Haynes and the Cotsworth family branches equally. During the last four years of her life, however, while living with daughter Dorcas, Mrs. Dutrow's will went through a series of changes which drastically favored Dorcas and her children while diminishing and excluding the interests of the Haynes brothers. These changes, and their surrounding circumstances, bear most weightily upon the issue of undue influence.

Shortly after moving in with Dorcas, following a conference between her daughter and Stevens, the first of many will and trust changes was made by Mrs. Dutrow on July 25, 1973. Under the new provisions of the will, Mrs. Dutrow's residuary estate was to be divided into two equal trusts, one for Dorcas, the principal of which Dorcas could invade up to certain limits and the other a trust with income to each of the Haynes boys without a power of invasion. A new will and an inter vivos trust with almost identical provisions, including approximately 60,000 shares of Ralston Purina stock, were later executed on November 24, 1973 and December 4, 1973, respectively. Mrs. Dutrow also gave Dorcas 5,000 shares of stock outright to compensate her for the expense of having Mrs. Dutrow live with her.

During the time these instruments were being drawn, Dorcas and her husband, John Cotsworth, began actively to express their views about Mrs. Dutrow's estate plans to Stevens. In a meeting between Stevens, Mrs. Dutrow, and the Cotsworths on November 13, 1973 at the Cotsworth home in Short Hills, John Cotsworth gave Stevens two charts of Mrs. Dutrow's estate which Cotsworth had prepared. According to Stevens' testimony at trial, the import of the charts was to make "substantial outright gifts to the members of the Cotsworth family and smaller gifts to [plaintiffs, the Haynes children]." Stevens further testified that Mrs. Dutrow had told him at this meeting that the pressure upon her by the Cotsworths to change her will was enormous. On November 19, 1973, John Cotsworth wrote Stevens a long letter in which he summarized what he, Cotsworth, saw as Mrs. Dutrow's "objectives" with regard to her estate plans and then detailing in over five pages the calculations as to how these "objectives" could be achieved. An important aspect of his proposal was to deplete substantially the estate to simplify Mrs. Dutrow's "money worries." Cotsworth further noted at the beginning of this letter to Stevens that

> [o]ur joint obligation—you and the family—is to accomplish these objectives with minimum tax effects upon the total estate. Obviously you are in a far better position to work out the details than I am, but you appear reluctant to go as fast or as far as I have suggested for reasons that are not clear to us.

Then, on November 26, 1973, Cotsworth proceeded to consult Grant Buttermore, his own lawyer, regarding Mrs. Dutrow's estate plans. Buttermore had been the attorney for the Cotsworth family and the Cotsworth family business, the Berry Steel Corporation, for six to seven years and had provided substantial legal advice concerning the corporation. He had also prepared wills for both Mr. and Mrs. Cotsworth and some of their children. For all intents and purposes, Buttermore can be viewed as having been the family attorney for the Cotsworths.

On November 29, 1973, following the initial contact by her husband, Dorcas Cotsworth went to Buttermore concerning the trust agreement of November 24 that Stevens had prepared for

her mother. As a result, Buttermore called Stevens while Dorcas was in his office and discussed the matter of Mrs. Dutrow's domicile. This subject, in addition to a proposal concerning "gifting" by Mrs. Dutrow, had earlier been broached to Buttermore by John Cotsworth. Both lawyers agreed that Mrs. Dutrow's domicile should be changed to New Jersey for tax purposes and Buttermore made the change on the instrument by hand. Later that day Buttermore wrote to Stevens to confirm the results of the call, as well as the fact that the Cotsworths were personally involved in Mrs. Dutrow's estate planning, *viz* :

> We are in the process of reviewing Mrs. Dutrow's estate with her and Mr. and Mrs. Cotsworth along the lines suggested by Mr. Cotsworth in his outline heretofore submitted to you.

Buttermore concluded this letter by relaying Mrs. Dutrow's request to Stevens to provide "a complete list of all [her] assets . . . in order that we may make a proper analysis."

Stevens immediately responded, writing separate letters to Buttermore and Mrs. Dutrow on November 30. He gave Buttermore a skeletal list of Mrs. Dutrow's assets with no detail. At the same time he also undertook to make some technical corrections of Mrs. Dutrow's will, which was executed, as noted, on December 4. In the letter accompanying the will, he mentioned his conversation with Buttermore and his "assumption" that Mrs. Dutrow wanted him to give Buttermore the information he was requesting.

The response to this communication was a letter written to Stevens on December 3, 1973 in Dorcas Cotsworth's handwriting on her personal stationary, and signed by Dorcas and Mrs. Dutrow, which contained the following:

> These are my mother's observations as she sits here besides me—and she insists she is *not* being pressured. . . .
>
> Mother and I have discussed this so often—now she says get it over and let me forget it—as it worries her with everything undone
>
> . . . .
>
> Her desire and intent is to have Dorcas rewarded while alive—to have an Irrevocable Trust set up to let Dorcas have income and right to sprinkle money to Grandchildren when necessary. . . .
>
> When Dorcas dies then the per stirpes takes over. . . .

Mother approves of Mr. Grant Buttermore knowing all details and keeping in this estate.

A meeting of Buttermore and John Cotsworth with Stevens was scheduled for December 13, 1973. Prior to this meeting Buttermore met with Mrs. Dutrow alone, as he testified was his customary practice, "so that I could get the intent directly from ... the testatrix." During this two hour conference, according to Buttermore, he explained various legal and tax aspects of estate planning to Mrs. Dutrow. He also told her "that intent was much more important and controlled over the other two items, meaning taxation and liquidity." Buttermore also reviewed at length Mrs. Dutrow's assets and her present will and trusts. Among other things, Mrs. Dutrow, according to Buttermore's testimony, said that "her first priority was to make sure she had enough to last during her lifetime," for which purpose Mrs. Dutrow said she would need $26,000 per year. Buttermore also explained to Mrs. Dutrow that the practical effect of the per stirpes disposition of the November 24 trust agreement would be to enable the two plaintiffs, the Haynes brothers, ultimately to "receive twice as much as each of the other grandchildren," to which Mrs. Dutrow responded, according to Buttermore, "I didn't realize that."

Buttermore testified that he told Stevens at the December 13 meeting that Mrs. Dutrow "wanted to go to the per capita basis equally among the grandchildren." Stevens, according to Buttermore, was very skeptical that Mrs. Dutrow wanted to do this and asked Buttermore to doublecheck it with her. Buttermore replied that "[i]n my mind she'd already made that decision after our talk on December the eleventh."

On December 17 and 18, a concerned Stevens wrote Buttermore letters confirming the discussion of December 13, and on December 18, specifically adverted to the possibility of "undue influence." There is no indication in the record that Buttermore responded to Stevens on this matter.

Buttermore, in response to a call from Dorcas Cotsworth, again met alone with Mrs. Dutrow in Short Hills on January 11

to discuss a problem concerning some back dividends. While he was with her, Buttermore, at his own initiative, told her what had happened during his December 13 meeting with Stevens and John Cotsworth and reviewed with her Stevens' letter of December 17 concerning her estate plans. Following that exchange, Buttermore related, Mrs. Dutrow instructed *him* to "draw the papers." Although Stevens had previously asked Buttermore to write him in Vermont, where he was vacationing, if there were any further developments concerning Mrs. Dutrow's estate planning, Buttermore did not do so, apparently believing that Mrs. Dutrow, who complained of Stevens' absence, did not desire or need Stevens to be further involved. Thus, Buttermore, still the Cotsworths' attorney, also stepped in, exclusively, as Mrs. Dutrow's attorney for purposes of planning her estate.

Significantly, at this juncture, drastic changes in Mrs. Dutrow's estate planning materialized. According to Buttermore, he and Mrs. Dutrow then proceeded to discuss in detail her wishes for a new will and trust agreements. Mrs. Dutrow assertedly indicated that she wanted "to leave [her estate] equally . . . between the grandchildren," and did not care about the adverse tax consequence which Buttermore claimed he had explained to her. Buttermore also seemed to minimize the effect of the proposed change allegedly requested by Mrs. Dutrow by pointing out to her that altering the particular trust in question would not accomplish her goals; although all six grandchildren would inherit equally under the particular trust in question, the consequence of other trusts already in existence would be that the two Haynes grandchildren would "still be getting greater in the end" than Mrs. Cotsworth's children. During that meeting, Buttermore also apparently showed Stevens' letter of December 18 concerning undue influence to Mrs. Dutrow.

These discussions resulted in the near total severance of the Haynes children from their grandmother's estate. Assertedly, at Mrs. Dutrow's request, Buttermore promptly prepared two new trust agreements, which provided for the payment of

income with full right of invasion of principal to Dorcas Cotsworth during her lifetime and that, upon Dorcas' death, "the then remaining balance in said trust shall be divided equally among settlor's grandchildren." In addition, Mrs. Dutrow's new will provided for the bequest of all her tangible personal property to Dorcas Cotsworth, "or if she does not survive me to my grandchildren who survive me, equally." These instruments were executed by Mrs. Dutrow on January 16, 1974.

On January 19 Buttermore sent Stevens copies of the new instruments along with a letter in which he explained that after going over everything "meticulously with Mrs. Dutrow," the new instruments had been prepared "along the lines we have discussed" and that, in Stevens' absence, Mrs. Dutrow had become "quite upset with the Fidelity Bank and decided that she wanted to immediately revoke" the existing trust agreements and will. Stevens testified to astonishment at the proposed distribution. He also expressed surprise about the provision in both trust agreements, which permitted Dorcas Cotsworth to withdraw the principal each year so that, if exercised, there might be nothing left when she died.

In early May 1974 Buttermore again met with Mrs. Dutrow to make some changes in the trust agreements. The most important change allowed the corporate trustee First National State Bank of New Jersey to distribute principal, "in its sole discretion," to Dorcas Cotsworth and any of Mrs. Dutrow's grandchildren (i. e., plaintiffs as well as Dorcas' children). This was in contrast to the original terms of this trust agreement, as executed by Mrs. Dutrow in January 1974, which allowed for such discretionary distribution by the bank only to Mrs. Cotsworth and her children, not to plaintiffs. According to Buttermore's testimony, this change was clearly Mrs. Dutrow's idea.

On April 24, 1975, Mrs. Dutrow amended the revocable trust agreement and added a codicil to her will in order to add *in terrorem* clauses to each instrument. Both the amendment and the codicil were prepared by Buttermore. At trial, Buttermore

said that Mrs. Dutrow had decided to add the clause after reading that J. Paul Getty had included such a clause in his will to prevent litigation.

Buttermore next met with Mrs. Dutrow to discuss her estate on December 11, 1975. At this meeting, according to Buttermore's testimony, Mrs. Dutrow told him that she had decided to give her estate, other than special bequests or amounts, to Dorcas Cotsworth, to enable Dorcas to enjoy it during Dorcas' lifetime. Buttermore testified that he was "taken by surprise" by this proposal and tried to explain to Mrs. Dutrow that this change would result in additional taxes of between $700,000 and $800,000 when Dorcas died. But, according to Buttermore, Mrs. Dutrow insisted on making the change. The necessary amendments to the revocable trust agreement were prepared by Buttermore and executed by Mrs. Dutrow on January 9, 1976, providing for distribution of the principal to Dorcas upon Mrs. Dutrow's death, or, if Dorcas was not then living, equally among Mrs. Dutrow's grandchildren. A new will executed the same day provided, as had previous wills, that Dorcas would inherit all of Mrs. Dutrow's tangible personal property. The final change made by Mrs. Dutrow in her estate plans before she died in September 1977, was to amend the revocable trust to give $10,000 to each of her grandchildren at her death, apparently realizing that otherwise the Haynes children would likely not inherit anything.

The last testamentary document executed by the testatrix was a will dated April 8, 1976. It contained no further major changes in her dispositions. Mrs. Dutrow died on September 27, 1977 and her final will was admitted to probate by the Surrogate of Ocean County on October 12, 1977, with the First National State Bank of New Jersey as executor.

## II

In any attack upon the validity of a will, it is generally presumed that "the testator was of sound mind and competent

when he executed the will." *Gellert v. Livingston*, 5 *N.J.* 65, 71 (1950). If a will is tainted by "undue influence," it may be overturned. "Undue influence" has been defined as "mental, moral or physical" exertion which has destroyed the "free agency of a testator" by preventing the testator "from following the dictates of his own mind and will and accepting instead the domination and influence of another." *In re Neuman*, 133 *N.J.Eq.* 532, 534 (E. & A. 1943). When such a contention is made

> the burden of proving undue influence lies upon the contestant unless the will benefits one who stood in a confidential relationship to the testatrix and there are additional circumstances of a suspicious character present which require explanation. In such case the law raises a presumption of undue influence and the burden of proof is shifted to the proponent. [*In re Rittenhouse's Will*, 19 *N.J.* 376, 378–379 (1955)]

Accord, *In re Blake's Will*, 21 *N.J.* 50, 55–56 (1956); *In re Davis*, 14 *N.J.* 166, 169 (1953); *In re Hopper*, 9 *N.J.* 280, 282 (1952), 5 *N.J. Practice* (Clapp, Wills and Administration) § 62 (3rd ed. 1962).

The first element necessary to raise a presumption of undue influence, a "confidential relationship" between the testator and a beneficiary, arises

> where trust is reposed by reason of the testator's weakness or dependence or where the parties occupied relations in which reliance is naturally inspired or in fact exists.... [*In re Hopper, supra*, 9 *N.J.* at 282]

■ Here, the aged Mrs. Dutrow, afflicted by the debilitations of advanced years, was dependent upon her sole surviving child with whom she lived and upon whom she relied for companionship, care and support. This was a relationship sustained by confidence and trust. The determination of the trial court, in this case, that there was a confidential relationship between the testatrix and the chief beneficiary of her will is unassailable.

■ The second element necessary to create the presumption of undue influence is the presence of suspicious circumstances which, in combination with such a confidential relationship, will shift the burden of proof to the proponent. Such circumstances need be no more than "slight." *In re Blake's Will, supra*, 21 *N.J.*

at 55–56; *In re Rittenhouse's Will, supra,* 19 *N.J.* at 379; *Gellert v. Livingston, supra,* 5 *N.J.* at 71; *In re Week's Estate,* 29 *N.J.Super.* 533, 540 (App.Div.1954).

In this case there were suspicious circumstances attendant upon the execution of the will. There was a confidential relationship between the testatrix and her attorney, who was also the attorney for the daughter and the daughter's immediate family. Furthermore, following the establishment of the confidential relationship of the daughter's attorney with the testatrix, there was a drastic change in the testamentary dispositions of the testatrix, which favored the daughter. These factors collectively triggered the presumption that there was undue influence in the execution of the will.

On this record, the trial court correctly posited a presumption of undue influence that shifted the burden of proof on this issue to the proponents of the will. The court concluded ultimately on this issue, however, that the proponents, the defendants, had overcome the presumption of undue influence. The trial judge determined that Mrs. Dutrow was of firm mind and resolve, that the final testamentary disposition, though markedly different from previous plans, was not unnatural or instinctively unsound and it represented her actual intent. Further, the court found the explanation for Mrs. Dutrow's final testamentary disposition to be candid and satisfactory.

The plaintiffs argue vigorously that the trial court's findings of fact and conclusions are not supported by sufficient evidence. They contend that in view of the strength of the presumption of undue influence created by the confidential relationships and the peculiarly suspicious circumstances of this case, there is an unusually heavy burden of proof required to disprove undue influence, which defendants failed to meet.

In this jurisdiction, once a presumption of undue influence has been established the burden of proof shifts to the proponent of the will, who must, under normal circumstances,

overcome that presumption by a preponderance of the evidence. *In re Week's Estate, supra,* 29 *N.J.Super.* at 538–539. Accord, *In re Estate of Churick,* 165 *N.J.Super.* 1, 5 (App.Div.1978), aff'd o. b., 78 *N.J.* 563 (1979); *In re Baker's Will,* 68 *N.J.Super.* 574, 587 (App.Div.1971). See *Gellert v. Livingston, supra,* 5 *N.J.* at 71 (1950). See generally 5 *N.J. Practice, supra,* § 62. As stated by Judge Clapp in *In re Week's Estate, supra:*

> In the case of a presumption of undue influence, apparently because the presumption is fortified by policy, the proponent must, according to the language of the cases, prove, to the satisfaction of the trier of fact, that there was no undue influence. In connection with this presumption, unlike other presumptions, the courts do not speak as to the burden of going forward with the evidence. However, we conclude, the moment this presumption is erected, both the burden of proof . . . and the burden of going forward with proof, shift to the proponent and are identical and coincident. To meet each of these assignments, the proponent must establish by the same quantum of proof—that is, by a preponderance of the proof—that there is no undue influence. [29 *N.J.Super.* at 538–539 (citations omitted)]

*In re Week's Estate, supra,* recognized, however, that there were situations calling for a stronger presumption of undue influence and a commensurately heavier burden of proof to rebut the presumption. While in that case the presumption of undue influence was deemed to be rebuttable by a preponderance of evidence, the court acknowledged other

> cases where the presumption of undue influence is so heavily weighted with policy that the courts have demanded a sterner measure of proof than that usually obtaining upon civil issues. That is the situation, for instance, where an attorney benefits by the will of his client and especially where he draws it himself. [29 *N.J.Super.* at 539.]

It has been often recognized that a conflict on the part of an attorney in a testimonial situation is fraught with a high potential for undue influence, generating a strong presumption that there was such improper influence and warranting a greater quantum of proof to dispel the presumption. Thus, where the attorney who drew the will was the sole beneficiary, the Court required "substantial and trustworthy evidence of explanatory facts" and "candid and full disclosure" to dispel the presumption

of undue influence. *In re Blake's Will,* 21 *N.J.* 50, 58–59 (1956). And, where an attorney-beneficiary, who had a preexisting attorney-client relationship with the testatrix, introduced the testatrix to the lawyer who actually drafted the challenged will, this Court has required evidence that was "convincing or impeccable," *In re Rittenhouse's Will, supra,* 19 *N.J.* at 382, "convincing," *In re Hopper, supra,* 9 *N.J.* at 285, and, "clear and convincing," *In re Davis, supra,* 14 *N.J.* at 170. Accord, *In re Baker's Will, supra;* see *In re Estate of Lehner,* 142 *N.J.Super.* 56 (App.Div.1975), rev'd on other grounds, 70 *N.J.* 434 (1976); *cf. In re Estate of Churick, supra,* 165 *N.J.Super.* at 5 (applying lower burden of proof where testator advised by independent attorney); *In re Week's Estate, supra* (same).

In imposing the higher burden of proof in this genre of cases, our courts have continually emphasized the need for a lawyer of independence and undivided loyalty, owing professional allegiance to no one but the testator. In *In re Rittenhouse's Will, supra,* 19 *N.J.* at 380–382, the Court questioned the attorney's independence and loyalty in view of the attorney-beneficiary's role in bringing the draftsman and the testatrix together, noting that the beneficiary had been "unable to give a satisfactory explanation of the relationship" between himself, the draftsman and the testatrix, *viz*:

> [I]t would appear the testatrix did not independently choose [the draftsman] as the scrivener of her will. It is fair to assume from the record that she was influenced to do so by [the beneficiary].

Similarly, in *In re Davis, supra,* 14 *N.J.* at 171, the Court observed:

> We wish to reiterate what has been said repeatedly by our courts as to the proprieties of a situation where the testatrix wishes to make her attorney or a member of his immediate family a beneficiary under a will. Ordinary prudence requires that such a will be drawn by some other lawyer of the testatrix' own choosing, so that any suspicion of undue influence is thereby avoided. Such

steps are in conformance with the spirit of *Canons* 6, 11, of the *Canons of Professional Ethics* promulgated by this court.[2]

See also *In re Hopper, supra,* 9 *N.J.* at 282.

It is not difficult to appreciate the policy reasons for creating an especially strong presumption of undue influence in cases of attorney misconduct. Such professional delinquency is encompassed by our official rules governing the professional ethics of attorneys. Our disciplinary rules cover all gradations of professional departures from ethical norms, and, the existence of an ethical conflict exemplified in this case is squarely posited under DR 5–105.[3] This ethical rule prohibits an attorney from engaging in professional relationships that may impair his independent and untrammeled judgment with respect to his client. This disciplinary stricture

should be practically self-demonstrative to any conscientious attorney. There is nothing novel about the ethical dilemma dealt with by DR 5–105. A lawyer

---

[2]This concern for attorney independence and loyalty to the testator is reflected in the decisional law of other jurisdictions. *E. g., In re Estate of Carpenter,* 253 *So.*2d 697 (Fla. S.Ct. 1971); *White v. Palmer,* 498 *P.*2d 1401 (Okla. S.Ct. 1971); *In re Day's Estate,* 198 *Or.* 518, 257 *P.*2d 609 (1953).

[3]DR 5–105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

(C) In situations covered by DR 5–105(A) and (B) except as prohibited by rule, opinion, directive or statute, a lawyer may represent multiple clients if he believes that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the facts and of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment.

cannot serve two masters in the same subject matter if their interests are or may become actually or potentially in conflict. [*In re Chase,* 68 *N.J.* 392, 396 (1975)]

So pervasive and fundamental is the ethical reach of DR 5–105 that ethical violations of this disciplinary rule based upon conflicts of interest have been found in a myriad of situations and in almost every walk of professional life.[4] Such conflicts often arise where there is dual representation. *E. g., In re Krakauer,* 81 *N.J.* 32 (1979); *In re Dolan,* 76 *N.J.* 1 (1978). See "Developments of the Law—Conflicts of Interest in the Legal Profession," 94 *Harv.L.Rev.* 1244, 1292–1315 (1961). A conflict of interest, moreover, need not be obvious or actual to create an ethical impropriety. The mere possibility of such a conflict at the outset of the relationship is sufficient to establish an ethical breach on the part of the attorney. *In re Kushinsky,* 53 *N.J.* 1, 5 (1968); *In re Braun,* 49 *N.J.* 16, 18 (1967); *In re Blatt,* 42 *N.J.* 522, 524 (1964); *In re Kamp,* 40 *N.J.* 588, 595 (1963). Even where the representation of two clients has become a routine practice on the part of the bar generally, when the latent conflict becomes real, the attorney must fully disclose all material information and, if need be, extricate himself from the conflict by terminating his relationship with at

---

[4]There are numerous published opinions illustrating the broad application of DR 5–105, *e. g.,* where an attorney abused his powers as a trustee, *In re Herbstman,* 84 *N.J.* 485 (1980); where an attorney's actions appeared to conflict with public duties, *In re Opinion No. 452,* 87 *N.J.* 45 (1981), *Perillo v. Advisory Commission Professional Ethics,* 83 *N.J.* 366 (1980), *In re Opinion No. 415,* 81 *N.J.* 318 (1979), *In re Dolan,* 76 *N.J.* 1 (1978); where an attorney failed to disclose his interest in real estate when advising a client to invest, *In re Wolk,* 82 *N.J.* 326 (1980); where the attorney represented both sides in a real estate transaction, *In re Krakauer,* 81 *N.J.* 32 (1979), *In re Dolan, supra, In re Lanza,* 65 *N.J.* 347 (1974), or a loan transaction, *In re Chase,* 68 *N.J.* 392 (1975), or both husband and wife, *In re Braun,* 49 *N.J.* 16 (1967), or both a corporate and individual defendant, *In re Kushinsky,* 53 *N.J.* 1 (1968). It is also a fundamental breach of ethics to represent one party in litigation arising out of the same cause for which the attorney had represented the opposing party, *In re Palmieri,* 76 *N.J.* 51, 61–63 (1978); *In re Cipriano,* 68 *N.J.* 398 (1975). See "Developments in the Law—Conflicts of Interest in the Legal Profession," 94 *Harv.L.Rev.* 1244, 1284–1315 (1961).

least one party. *Cf. Lieberman v. Employers Ins. of Wausau*, 84 *N.J.* 325, 338–340 (1980) (conflict of interest on part of insurance defense counsel who normally represented both the insured and the insurer).

Accordingly, it is our determination that there must be imposed a significant burden of proof upon the advocates of a will where a presumption of undue influence has arisen because the testator's attorney has placed himself in a conflict of interest and professional loyalty between the testator and the beneficiary.[5] In view of the gravity of the presumption in such cases, the appropriate burden of proof must be heavier than that which normally obtains in civil litigation. The cited decisions which have dealt with the quantum of evidence needed to dispel the presumption of influence in this context have essayed various descriptions of this greater burden, *viz*: "convincing," "impeccable," "substantial," "trustworthy," "candid," and "full." Our present rules of evidence, however, do not employ such terminology. The need for clarity impels us to be more definitive in the designation of the appropriate burden of proof and to select one which most suitably measures the issue to be determined. See, *e. g., In re Week's Estate, supra.* Only three burdens of proof are provided by the evidence rules, namely, a preponderance, clear and convincing, and beyond a reasonable doubt. *Evid.R.* 1(4). The standard in our evidence rules that conforms most comfortably with the level of proofs required by our decisions in this context is the burden of proof by clear and convincing evidence.[6] *In re Davis, supra*, 14 *N.J.* at 170; *cf. Sarte v. Pidoto*, 129 *N.J.Super.* 405, 411 (App.Div.1974) (*de facto*

---

[5] *In re Estate of Lehner*, 70 *N.J.* 434 (1976), was the case primarily relied upon by the trial judge as requiring only a preponderance of the evidence. In *Lehner*, where the attorney who had drawn the testator's will was under a later will named as sole beneficiary, the Appellate Division articulated a standard of proof that we understand to mean and equate with the level of clear and convincing evidence, *viz*:

use of a standard stricter than preponderance of the evidence entails proof by clear and convincing evidence under rules of evidence). Hence, the presumption of undue influence created by a professional conflict of interest on the part of an attorney, coupled with confidential relationships between a testator and the beneficiary as well as the attorney, must be rebutted by clear and convincing evidence.

The presumption is "overborne by *substantial and trustworthy* evidence of explanatory facts to the contrary." *In re Blake's Will, supra*, 21 *N.J.* at 58 ... [T]he proponent's testimony "did not have the *convincing* or *impeccable* quality required by our decisions to remove the aura of suspicion." *In re Rittenhouse's Will, supra*, 19 *N.J.* at 382. [142 *N.J.Super* 56, 66–67 (1975).]

In reversing the Appellate Division, this Court disagreed with its conclusion that the presumption of undue influence had not been overcome. Nevertheless, the Court did not directly or by implication reject the authorities relied upon by the Appellate Division which indicated that the proper burden of overcoming the presumption of undue influence in such circumstances was greater than a preponderance of the evidence.

[6]In an analogous context, *N.J.S.A.* 2A:81–2 (the so-called "Dead Man's Act") requires proof of a decedent's oral promise, statement or act to be made by clear and convincing proof. See, *e. g., In re Dodge*, 50 *N.J.* 192 (1976); *Moran v. Pellegrino's Estate*, 90 *N.J.Super.* 122 (App.Div.1966); but see *Germann v. Matriss*, 55 *N.J.* 193 (1970). Although not directly applicable in this case because the claim is founded upon a writing, namely, the will, the validity of that written document depends upon the oral statements of the decedent; and it is the decedent's oral statements, as testified to by the very witnesses who are accused, presumptively, of undue influence, that constitute the evidence needed to demonstrate that there was no undue influence. Thus, the policy reflected in this statute is germane to a will controversy involving charges of undue influence. *Cf. Garden State Development Co. v. Markowitz*, 47 *N.J.* 1, 4 (1966) (statute not limited to particular type of action or witness but requires trier of fact "to be watchful against falsehoods which cannot be denied.").

Likewise, in other contexts, where the evidence is potentially unreliable, a high burden is imposed. *State v. Hurd*, 86 *N.J.* 525 (1981). Similarly, where the available and usual testimonial evidence is almost exclusively within the possession of one party and is intrinsically subjective, often unverifiable and usually self-serving, courts have felt impelled to impose a higher burden of proof. *E. g., Sarte v. Pidoto*, 129 *N.J.Super.* 405 (App.Div. 1974).

Accordingly, although we need not decide the issue today, there may be situations other than those raised in this case, which require that the presumption of undue influence be overcome by clear and convincing evidence rather than the normal requirement that only a preponderance of

Applying these principles to this case, it is clear that attorney Buttermore was in a position of irreconcilable conflict within the common sense and literal meaning of DR 5–105. In this case, Buttermore was required, at a minimum, to provide full disclosure and complete advice to Mrs. Dutrow, as well as the Cotsworths, as to the existence and nature of the conflict and to secure knowing and intelligent waivers from each in order to continue his professional relationship with Mrs. Dutrow. DR 5–105(C). Even these prophylactic measures, however, might not have overcome the conflict, nor have been sufficient to enable the attorney to render unimpaired "independent professional judgment" on behalf of his client, DR 5–105(B); see *Lieberman v. Employers Ins. of Wausau, supra,* 84 *N.J.* at 338–340. Any conflict, of course, could have been avoided by Buttermore simply refusing to represent Mrs. Dutrow. DR 5–105(A), (B); see *In re Davis, supra,* at 171. But Buttermore was apparently insensitive or impervious to the presence or extent of the professional conflict presented by these circumstances. He undertook none of these measures to eliminate the dual representation or overcome the conflict.[7] Consequently, a

---

the evidence need be proven. See *supra* at 178–179. Thus, for example, Judge Clapp would impose the higher burden "where the finger of suspicion points strongly at the proponent, implicating him with the alleged undue influence and . . . where the rebuttal of the presumption must come from him." 5 *N.J. Practice* (Clapp, Wills and Administration) § 62 (3d ed. 1962, Supp.1980).

[7]In this case, we recognize that Buttermore believed in good faith that he was taking proper precautions to overcome or avoid the consequences of the improper conflict and did not believe or perceive that his position involved an impermissible conflict of interest in light of these measures. He also expressed the view that frequently estate planning involves members of an entire family and therefore no conflict exists for an attorney who has professional relationships with members of the family, in addition to the testator. This position is, of course, inconsistent with our explicit holding that such conduct, as exemplified by the facts of this case, violates DR 5–105. Since this application of DR 5–105 to such situations has not been generally acknowledged, we do not think it fair that ethical sanctions be pursued

strong taint of undue influence was permitted, presumptively, to be injected into the testamentary disposition of Mrs. Dutrow.

Accordingly, the attorney's conduct here, together with all of the other factors contributing to the likelihood of wrongful influence exerted upon the testatrix, has engendered a heavy presumption of undue influence which the proponents of the will must overcome by clear and convincing evidence.

This determination that clear and convincing evidence must be marshalled to overcome the presumption of undue influence appropriately requires that the matter be remanded to the trial court for new findings of fact and legal conclusions based upon application of this burden of proof. We remand, recognizing that there is considerable evidence in the record as to Mrs. Dutrow's intelligence, independence and persistence, of her alienation, to some extent, from the Haynes children, and as to her natural intent primarily to benefit her children, rather than her grandchildren. Moreover, all of this evidence is based upon the credibility of witnesses, which we cannot independently evaluate. We are also mindful that the trial court found that the explanation for Mrs. Dutrow's testamentary disposition was candid and satisfactory.

Nevertheless, the trial court does not appear to have given full weight to the additional significant factor generating the heightened presumption of undue influence in this case, namely, that occasioned by the conflict of interest on the part of the attorney drafting the will, whose testimony was crucial to the outcome of this case. Most importantly, the court's conclusion was premised upon an application of the conventional standard of proof entailing only a preponderance of the evidence. We therefore cannot with any certitude predict that the trial court's findings of fact and resultant conclusions would be the same were he to reassess the evidence, imposing upon the proponents

retroactively in this case for such conduct, since there are no additional aggravating circumstances. See *In re Smock*, 86 *N.J.* 426 (1981).

of the will the burden of proof of lack of undue influence by clear and convincing evidence. Consequently, the fair disposition, which we now direct, is to remand the matter to the trial court for a redetermination of facts and conclusions based upon the record.

### III

The second issue involves the enforceability of the *in terrorem* clauses challenged by the plaintiffs. The trial court noted that under the State's common law, *in terrorem* clauses are enforceable when the contest is based upon an allegation of undue influence, even if probable cause and good faith are present. The trial judge nonetheless declared the clauses unenforceable because the new probate code, *N.J.S.A.* 3A:2A–32, admittedly not controlling in this case because of the date of Mrs. Dutrow's death, "provides that *in terrorem* clauses are unenforceable if probable cause exists" and, following the lead of the new code on this point, the court refused to enforce the clauses, noting that its ruling was "in accord with the authoritative view and the modern trend."

On this latter issue, the Appellate Division found that there was no basis in law for the trial court's decision, and that although the new probate code, *N.J.S.A.* 3A:2A–32, changed the law with respect to wills, the change applied only to wills of decedents who died on or after September 1, 1978, nearly a year after Mrs. Dutrow's death. In addition, the Appellate Division found no indication that the new statute is meant to apply to trusts. Furthermore, the court said in support of reversal on this issue, "[e]nforcement of the *in terrorem* clause is particularly equitable here."

As noted earlier, on April 24, 1975, Mrs. Dutrow amended the revocable trust agreement and added a codicil to her will in order to add *in terrorem* clauses to each instrument. The clause in the amendment to the revocable trust agreement, almost identical to that in the will, provided:

> If any beneficiary under this trust shall contest the validity of, or object to this instrument, or attempt to vacate the same, or to alter or change any of the provisions hereof, such person shall be thereby deprived of all beneficial interest thereunder and of any share in this Trust and the share of such person shall become part of the residue of the trust, and such person shall be excluded from taking any part of such residue and the same shall be divided among the other persons entitled to take such residue.[8]

In 1977 the Legislature enacted *N.J.S.A.* 3A:2A–32 as part of the new probate code.[9] This statute renders *in terrorem* clauses in wills unenforceable if probable cause for a will contest exists:

> A provision in a will purporting to penalize any interested person for contesting the will or instituting other proceedings relating to the estate is unenforceable if probable cause exists for instituting proceedings.

In *Alper v. Alper*, 2 *N.J.* 105 (1949), the Court said that the existence of probable cause to bring the challenge to the will should result in nonenforcement of an *in terrorem* clause "where the contest of the will is waged on the ground of forgery or subsequent revocation by a later will or codicil." However, where typical grounds of challenge were advanced—"fraud, undue influence, improper execution or lack of testamentary capacity"—the clause was deemed to be enforceable, notwithstanding probable cause, as a safeguard against deleterious, acrimonious and wasteful family litigation. *Id.* at 112–113. Accord, *Provident Trust Co. v. Osborne*, 133 *N.J.Eq.* 518, 521 (Ch.1943). See also *In re Estate of Badenhop*, 61 *N.J.Super.* 526, 535 (Cty.Ct.1960).

The new statute, *N.J.S.A.* 3A:2A–32, however, abolishes the distinction drawn by the Court in *Alper* between cases in which *in terrorem* clauses in wills shall be enforced, and those in which they shall not, stating quite simply that *whenever* there is

---

[8]If enforced, the result would be to deprive each of the two plaintiffs of $10,000 which they were to receive under this trust agreement as modified by the fourth amendment thereto of April 7, 1976.

[9]*N.J.S.A.* 3A:2A–32 is identical to Uniform Probate Code (U.L.A.) § 3–905 (1969). The Uniform Probate Code has been adopted in its entirety by fourteen states and two others, of which New Jersey is one, have adopted some portions of it.

probable cause to contest a will, the clause should not be enforced. While the statute applies neither to the will in this case, which was probated prior to the statute's effective date, nor to the trust agreement, since the statute applies only to wills, the statute is indicative of a legislative intent to create a policy less inhibitory to the bringing of challenges to testamentary instruments. There does not appear to be any logical reason why the purpose of the statute should not be presently recognized and be applied equally to trust instruments or should not be applied in the circumstances of this case.

There are public policy considerations both favoring and disfavoring the enforcement of *in terrorem* clauses. On the one hand, such provisions seek to reduce vexatious litigation, avoid expenses that debilitate estates and give effect to a testator's clearly expressed intentions. *E. g., Alper v. Alper, supra; Smithsonian Institution v. Meech*, 169 *U.S.* 398, 413–415, 18 *S.Ct.* 396, 402, 42 *L.Ed.* 793, 800–801 (1898); *In re Hite's Estate*, 155 *Cal.* 436, 101 *P.* 443 (1909); *Rudd v. Searles*, 262 *Mass.* 490, 160 *N.E.* 882 (1928); *Commerce Trust Co. v. Weed*, 318 *S.W.*2d 289 (Mo.Sup.Ct.1958); *Elder v. Elder*, 84 *R.I.* 13, 120 *A.*2d 815 (1956).

On the other hand, a majority of jurisdictions have declined to enforce *in terrorem* clauses where challenges to testamentary instruments are brought in good faith and with probable cause. *E. g., South Norwalk Trust Co. v. St. John*, 92 *Conn.* 168, 101 *A.* 961 (1917); *In re Cocklin's Estate*, 236 *Iowa* 98, 17 *N.W.*2d 129 (1945); *In re Foster's Estate*, 190 *Kan.* 498, 376 *P.*2d 784 (1963); *In re Hartz's Estate*, 247 *Minn.* 362, 77 *N.W.*2d 169 (1956); *Ryan v. Wachovia Bank & Trust Co.*, 235 *N.C.* 585, 70 *S.E.*2d 853 (1952); *Wadsworth v. Brigham*, 125 *Or.* 428, 259 *P.* 299 (1927); *In re Friend's Estate*, 209 *Pa.* 442, 58 *A.* 853 (1904); *Rouse v. Branch*, 91 *S.C.* 111, 74 *S.E.* 133 (1912); *Tate v. Camp*, 147 *Tenn.* 137, 245 *S.W.* 839 (1922); *In re Chappell's Estate*, 127 *Wash.* 638, 221 *P.* 336 (1923); *Dutterer v. Logan*, 103 *W.Va.* 216, 137 *S.E.* 1 (1927); *In re Keenan's Will*, 188 *Wis.* 163, 205 *N.W.* 1001 (1925).

Given this relative equipoise of considerations, it is entirely appropriate for the courts to be sensitive and responsive

to the Legislature's perception of the public interest and policy in these matters.  See *Knight v. Margate*, 86 *N.J.* 374 (1981); *Kruvant v. Mayor & Council Tp. of Cedar Grove*, 82 *N.J.* 435 (1980).  The assessment, balancing and resolution of these concerns by the Legislature, now reflected in the statute law, is, of course, not binding upon the judiciary's decisional authority in a matter not governed by such enactments.  Nevertheless, the legislative handling of the subject is, and should be, strongly influential in the judicial quest for the important societal values which are constituent elements of the common law and find appropriate voice in the decisions of the court expounding the common law.  See *Van Beeck v. Sabine Towing Co.*, 300 *U.S.* 342, 351, 57 *S.Ct.* 452, 456, 81 *L.Ed.* 685, 690 (1937).

We therefore decline to enforce an *in terrorem* clause in a will or trust agreement where there is probable cause to challenge the instrument.  The trial court concluded that the plaintiffs in this case "proceeded in good faith and on probable cause."  That finding is amply supported by evidence of record.

## IV

We have determined that *in terrorem* clauses in the will and trust instruments are not enforceable.  We have also directed, for reasons set forth in this opinion, that the case be remanded for new findings of fact and legal conclusions with respect to the major issue of undue influence in the execution of the will.

Accordingly, the judgment below is reversed and the matter remanded.  Jurisdiction is not retained.

CLIFFORD, J., dissenting in part.

I am in full accord with the majority's meticulous treatment of the "undue influence" issue, but I part company on its decision concerning the *in terrorem* clauses.

On April 24, 1975, when Mrs. Dutrow added the challenged clauses to the testamentary instruments, enforcement of *in terrorem* clauses was perfectly in keeping with the public policy

of this state, as it was at the time of the testator's death in 1977. As the Court acknowledges, *ante* at 187, that policy was to give effect to such clauses where, as here, the instrument was contested on the ground of undue influence. See *Alper v. Alper*, 2 *N.J.* 105, 112–13 (1949); *Provident Trust Co. v. Osborne*, 133 *N.J.Eq.* 518, 521 (Ch.1943). See also *In re Estate of Badenhop*, 61 *N.J.Super.* 526, 534–35 (Cty.Ct.1960). As *Alper* instructs us, an *in terrorem* clause is

> a reasonable safeguard against attempted overthrow of the testamentary dispositions by a disappointed heir, striving for an undue advantage, and a device to lessen the wastage of the estate in litigation and the chance of increasing family animosities by besmirching the reputation of the testator when he is no longer alive to defend himself and to discourage the contesting of wills as a means of coercing a settlement. [2 *N.J.* at 112.]

Mrs. Dutrow's intentions in insisting on such a provision comported entirely with the judicially-declared public policy as of the time she made her testamentary dispositions and as of the time of her death.

Instead of honoring the testator's manifest wishes, however, the court looks for guidance to a statute not effective until a year after her death. *N.J.S.A.* 3A:2A–32 renders *in terrorem* clauses in wills unenforceable if there exists probable cause for a will contest:

> A provision in a will purporting to penalize any interested person for contesting the will or instituting other proceedings relating to the estate is unenforceable if probable cause exists for instituting proceedings. [*N.J.S.A.* 3A:2A–32 (Supp.1981).] [1]

The majority bows to this "legislative handling" of the subject as an aid in the "judicial quest for the important societal values that are the constituent elements of the common law * * * ." Quite apart from the tardy surfacing of this newly recognized public policy is the shaky foundation upon which it rests. The Legislature, clearly in error (as forthrightly conceded by plaintiffs), believed that *N.J.S.A.* 3A:2A–32 codifies existing New Jersey case law on the subject. *See* Statement of Assembly

---

[1] I agree with the majority, *ante* at 188, that where it is applicable, the statute should affect trust instruments as well as wills.

Comm. on Judiciary, Law, Public Safety and Defense, Assembly Doc. No. 1717, L.1977, c. 412 (1977).[2] As demonstrated above, the statute does no such thing. It runs directly contrary to the case law.

We may view an *in terrorem* clause in a less charitable fashion than did the *Alper* court, perhaps as a device to wreak revenge on a disgruntled object of one's testamentary disposition. We may see such clauses as representing the most disagreeable impulses of a testator. They may lay bare one's mean, uncharitable, impervious, suspicious, hostile, downright churlish nature—and then some. I do *not* suggest that Mrs. Dutrow manifested any of those characteristics, but I *do* suggest that testators are allowed to exhibit all of them, and worse, without fear that a court will disregard their final wishes.

In keeping with both the testator's unambiguously-declared intent and the public policy of this state at the time of her death, I would give effect to the *in terrorem* clauses.

*For reversal* —Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—5.

*For affirmance* —None.

[2] The text of this statement appears in its entirety as an introduction to the new Decedents' Estates Code, immediately preceding the definitional section, *N.J.S.A.* 3A:2A–1 (Supp.1981).